# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

**People v. Torres, 2012 IL 111302**

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. ENCARNACION TORRES, Appellee. |
| Docket No. | 111302 |
| Filed | February 2, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The right to confront was denied by use of the preliminary hearing testimony of the State's key and unavailable witness where discovery (which was then unavailable) included his inconsistent statements and where the opportunity for the cross-examination which did take place was inadequate—murder conviction reversed. |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. James J. Schreier, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Lisa Madigan, Attorney General, of Springfield, and Anita Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, Tasha-Marie Kelly and Annette Collins, Assistant State's Attorneys, of counsel), for the People.<br><br>Stephen L. Richards, of Chicago, for appellee. |

Justices

JUSTICE KARMEIER delivered the judgment of the court, with opinion.

Chief Justice Kilbride and Justices Freeman, Thomas, Garman, Burke, and Theis concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a bench trial in the circuit court of Cook County, defendant, Encarnacion Torres, was found guilty of first degree murder and sentenced to 20 years' imprisonment. On appeal, defendant contended that the trial court violated his constitutional right to confront the witnesses against him when it permitted the State to introduce into evidence the preliminary hearing testimony of the State's key and unavailable witness, Leopoldo Pena. The defendant also argued that he was denied his constitutional right to effective assistance of counsel when trial counsel failed to file a motion to dismiss the indictment on the ground that the defendant was denied his constitutional right to a speedy trial. The appellate court rejected defendant's claim of ineffective assistance, but reversed and remanded, finding that Pena's preliminary hearing testimony was improperly admitted and the error could not be considered harmless. No. 1-08-3254 (unpublished order under Supreme Court Rule 23). We allowed the State's petition for leave to appeal (Ill. S. Ct. R. 315 (eff. Feb. 26, 2010)), and now affirm the judgment of the appellate court.

¶ 2                                  BACKGROUND
¶ 3                             Pretrial Proceedings
¶ 4    On July 31, 1983, the defendant was arrested for the shooting death of the victim, Diego Cisneros. The following day, the defendant was charged with murder pursuant to section 9-1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, ¶ 9-1).

¶ 5    On August 16, 1983, a preliminary hearing was held to determine whether there was probable cause to support the prosecution of defendant for Cisneros' murder. At that hearing, the defendant was represented by attorney Robert Grossman. Two witnesses testified: Leopoldo Pena and detective David Kristovic. Only Pena's testimony is relevant to the issues in this appeal.

¶ 6    In order to provide some context for the circumstances under which Pena was questioned, we quote from the principals' colloquy immediately preceding Pena's testimony:

> "MS. MARTIN [assistant State's Attorney]: Judge, I have made that amendment on the face of the complaint.
>
> THE COURT: Yes.
>
> MR. GROSSMAN [defense counsel]: Waive reswearing and reexecution.
>
> THE COURT: Very good. State's motion granted.
>
> MS. MARTIN: Ready to proceed.

-2-

MR. GROSSMAN: Motion to exclude witnesses.

THE COURT: Ready to proceed right now?

MS. MARTIN: Yes.

THE COURT: You are putting me in a funny position.

MS. MARTIN: Are you through your call yet?

THE COURT: You have to be kidding. Both ready?

MR. GROSSMAN: Yes.

THE COURT: Let's proceed.

MR. GROSSMAN: All right.

MS. MARTIN: I would be using an interpreter. We would have to have the interpreter sworn."

The interpreter was sworn, then the witness, and the preliminary hearing commenced amidst an obviously crowded docket, before a trial judge who had expressed some reluctance to immediately proceed with the hearing.

¶ 7 Upon direct examination, Pena testified that he worked as a bartender at a tavern located at 1752 West 47th Street in Chicago. According to Pena, at about 6 p.m., on July 30, 1983, he was in the tavern with the victim, Diego Cisneros, when the defendant walked in and asked for two six-packs of beer. The victim then told Pena that he and the defendant were from the same part of Mexico. As Pena was looking for the beers, he overheard parts of the conversation between the defendant and the victim. According to Pena, Cisneros asked the defendant what problems he had with his father; defendant purportedly responded, if he had any problems with Cisneros' father, "he wouldn't have to deal with him."

¶ 8 Pena testified that he gave the two six-packs of beer to defendant, and defendant placed the bag on a bar stool. However, the bag broke and a bottle of beer fell on the floor. Pena picked up the glass, put the beer in another bag, and then went to the back of the bar to get a mop to clean the floor. After Pena mopped the floor, he returned to the back of the bar to wash out the mop. He testified, at that point, he heard a gunshot. When Pena emerged from the back room, he saw the victim lying on the floor. Pena said he went to the door and "saw the person running." Pena then called the police. Pena testified that he observed the victim's body face up on the floor. He denied seeing a weapon in Cisneros' hand or in the area around his body.

¶ 9 Subsumed within Pena's preliminary hearing testimony was a very brief cross-examination of Pena by defense counsel. During that cross-examination, Pena stated he knew the victim "because he frequented the place." Defense counsel next attempted to ask Pena whether Pena knew the victim's father, but the court sustained the State's objection to that question. After defense counsel explained, "I'm going to go into bias or prejudice," the court told counsel to "go ahead." Defense counsel repeated the question, and Pena responded that he did not know the victim's father. Defense counsel then abandoned that line of inquiry altogether and never asked another question designed to probe for possible bias or prejudice.

¶ 10 Counsel turned to questions directed to Pena's observations and recall. On further cross-examination, Pena admitted that he never observed the defendant with a gun, and he did not

see the defendant shooting or standing over the victim. He said he was in the back room of the tavern for "no more than one or two minutes," when he heard the shot. Pena stated that the back room of the bar was about 10 to 15 feet away from the bar itself. He acknowledged, from his vantage point in the back room, he could not see what was going on in the bar; however, he stated, prior to the shot, he could hear the defendant and Cisneros "speaking in normal tones." Pena admitted he could not hear what was being said because "he had the water running." He testified, with certainty, that he did not hear "an argument" or any raising of voices.

¶ 11    In the course of—and as it turned out, the conclusion of—this brief cross-examination, defense counsel asked: "What day of the week was this?" The State objected and the court sustained the objection. Defense counsel querulously inquired: "How is that objectionable?" The court responded by simply reiterating: "Sustained." With that, defense counsel decided he had "[n]othing further of this witness."

¶ 12    Based on the testimony of Pena and Kristovic, the circuit court found probable cause and set the case for further proceedings.

¶ 13    Defendant subsequently failed to appear on the date set for his arraignment, and a warrant was issued for his arrest. Several months later, as a result of a countywide conversion of the circuit court's warrant recording system, several warrants, including defendant's, were accidentally purged from the system. According to allegations in a motion *in limine* subsequently filed by the State in 2007, the State's key witness, Leopoldo Pena, was deported to Mexico in October of 1984. No further details were provided regarding the circumstances that led to Pena's deportation.

¶ 14    During the period from 1983 to 2007, the defendant successfully avoided recognition by the authorities, despite at least three encounters with the Las Vegas police department in 1995 and 1996. In two instances, he identified himself as "David Quiroz." In the third encounter he identified himself as "Florentino Morado, Jr." Although defendant was fingerprinted on these occasions, his fingerprints did not trigger a search/recognition by the Chicago police department's computer system because of the accidental 1983 purge of the defendant's warrant from that system.

¶ 15    On July 26, 2006, the Chicago police department received a tip from a man identifying himself as the victim's cousin and claiming that he had just seen "his cousin's killer." After an investigation, the police discovered that the defendant's warrant and fingerprints had been accidentally deleted from the Chicago police department computer system. The police reentered the warrant and prints in the computer system and, after using the appropriate search engine, subsequently located the defendant at 8108 South Lorel in Burbank, Illinois. Defendant was arrested on January 3, 2007.

¶ 16    Prior to trial, the State filed a motion *in limine*, requesting that it be permitted to introduce the preliminary hearing testimony of Leopoldo Pena at trial. The State represented that Pena had been deported to Mexico in 1984 and was no longer available as a witness. As noted, the State provided no details as to the circumstances leading to Pena's deportation, and the defense apparently did not inquire. No testimony or evidence was presented at the hearing.

¶ 17     During the hearing on the State's motion, defense counsel argued that Pena's preliminary hearing testimony should not be admitted because by their very nature preliminary hearings occur prior to discovery. Counsel noted that attorney Grossman had been without certain material information, namely police reports, which included Pena's statements to police, and thus Grossman had been unable to adequately cross-examine Pena. In the course of his argument, defense counsel referenced several statements Pena purportedly made to police officers, statements that were inconsistent with Pena's preliminary hearing testimony and which were unavailable to counsel at the time of the preliminary hearing. According to defense counsel: (1) Pena told police that Cisneros had arrived at the tavern at 3:30 p.m., whereas he testified at the preliminary hearing that Cisneros arrived around 5 p.m.; (2) Pena told police that the defendant bought Cisneros a beer, something he failed to state at the preliminary hearing; and (3) Pena told the officers that Cisneros, while in the tavern, had tried to kiss a girl, who became angry and left with another man. Counsel also mentioned that the defendant, in his statement to police, insisted that he had acted in self-defense, and that they should "ask Pena, because he was present the entire time."

¶ 18     After hearing arguments by both parties, the circuit court granted the State's request to admit Pena's preliminary hearing testimony. The court acknowledged the difficulties defense counsel might encounter in impeaching Pena's preliminary hearing testimony with his inconsistent statements to police, and the court suggested that it would allow defense counsel to bring those statements out at defendant's trial without having to lay a foundation, either by way of cross-examination of the police officers who had made the relevant police reports or through a stipulation by the parties.

¶ 19                    Defendant's Trial

¶ 20     At defendant's bench trial, the State called Roberto Martinez, who was 16 years old at the time of the shooting in 1983. Martinez testified that on July 30, 1983, he was at the house of his friend, Francisco Saldivar, located at 4738 South Hermitage Street. At about 6 p.m., Martinez was on the front porch when he observed a man come from the rear of the building through the gangway. The man walked "kind of angerly" [*sic*] past Martinez, "jumped" into a car, and moved it up the block. Martinez stated that the man had come from the coach house behind the building and that prior to observing him, Martinez had heard an "argument" between "a lady and gentleman" at the rear of the building. According to Martinez, after moving the car, the man returned to the coach house, but reappeared later, this time with a silver handgun tucked into the back of his pants. Martinez saw the man enter his car a second time and drive away. When asked to describe the man, Martinez stated the man had a birthmark on his left eyebrow, an area of white discoloration.

¶ 21     Martinez stated, about 30 minutes later, he was still on the front porch when he observed the same man running southbound down the alley toward him, holding a brown paper bag and a gun in his hand. Martinez said soon thereafter he heard sirens, and he walked with Saldivar in the direction of the sirens to see what was going on. Martinez observed police cars parked in front of a tavern about a block away at the corner of 47th Street and Hermitage Street.

¶ 22    Martinez said he spoke to several officers at the scene and, later that night, went to the police station where he viewed a lineup. From that lineup, Martinez identified the defendant as the man he had observed with the gun. However, Martinez was unable to make an in-court identification of the defendant at trial.

¶ 23    On cross-examination, Martinez acknowledged that when he identified the defendant in the 1983 lineup, he qualified his identification, stating that he was "90 percent sure" defendant was the same person he had seen with the gun. He further admitted that when he observed defendant enter his car with a gun and drive off, he did not contact the police. Moreover, Martinez conceded on cross-examination that when he was initially interviewed by the police on July 30 and 31, 1983, he never stated that he saw defendant running back to the coach house with a gun in his hand; he had told them only that defendant was carrying a brown paper bag.

¶ 24    The State also called Francisco Saldivar as a witness. Saldivar testified he was 16 years old in 1983 and lived at 4738 South Hermitage Street. Saldivar stated that on July 30, 1983, at approximately 6 p.m., he was standing in front of his house with Martinez when a man walked in front of him with a gun in the waistband of his pants. The man walked through the gangway of the building and proceeded to the coach house in back.

¶ 25    Saldivar testified that he and Martinez thereafter "went for a walk" and noticed several police cars at Hermitage Street and 47th Street. After determining why the police cars were there, Saldivar approached a police officer and told him that he had just seen a man with a gun. Saldivar testified that later the same day he went to the police station to view a lineup. In that lineup, he identified defendant as the man he had seen with the gun. Saldivar was not asked to make an in-court identification of the defendant.

¶ 26    On cross-examination, Saldivar admitted that when he observed the man with the gun, the man was not running, but merely walked past him. Saldivar denied having described the gun to police as a silver .22-caliber revolver.

¶ 27    After Saldivar's testimony, several stipulations were entered of record in order to serve as the foundation for admission of Pena's testimony at the preliminary hearing. Those stipulations concerned testimony that would have been given by the assistant State's Attorney who questioned Pena at the preliminary hearing, the person who served as a Spanish interpreter for Pena, and the court reporter who prepared the preliminary hearing transcript. Following those stipulations, and over defense counsel's objection on grounds previously noted, Pena's testimony from the preliminary hearing was read into evidence.

¶ 28    Thereafter, the State called Chicago police detective David Golubiak. Golubiak testified that he investigated the Cisneros homicide on the evening of July 30, 1983. Upon his arrival at the scene, he proceeded into the tavern and observed the victim's body on the floor with a pool of blood next to the victim's head. Golubiak stated that the tavern and the victim's body were searched for a gun, but no weapon was found. Golubiak identified three witnesses who were interviewed by police at the scene: Martinez, Saldivar and Pena. Next door to the tavern, Golubiak discovered a parked car that was later identified as bearing an Illinois license plate registered to the defendant. The car was subsequently dusted for fingerprints, and two prints were found matching those of the defendant.

¶ 29    Golubiak further testified that, later on the night of the shooting, he spoke with Joel Rodriguez, who identified himself as the defendant's brother. After that conversation, the police proceeded to 5043 South Winchester Avenue, where they found defendant and placed him under arrest. After defendant's arrest, the police went to the coach house at 4738 South Hermitage Street, where they retrieved a silver .38-caliber revolver. The weapon was subsequently examined by the State's forensic scientist and firearm expert, but the parties stipulated that the examiner could not conclusively determine whether the bullet recovered from the victim's body was fired from that gun.

¶ 30    On cross-examination, Golubiak acknowledged that at the time he retrieved the gun from the coach house at 4738 South Hermitage Street, he had no reason to think that the defendant resided there. Further, Golubiak admitted that when he interviewed Martinez at the scene of the crime, Martinez never told him that Martinez had observed the defendant with a gun in his hand. When interviewed at the scene, Martinez only said that the defendant was carrying a brown paper bag. When Martinez later made reference to a gun, he told Golubiak the gun he observed in the man's pants was a .22-caliber handgun.

¶ 31    Next to testify was former Chicago police detective Roy Kwilos. Kwilos testified that he participated in this homicide investigation and, pursuant thereto, he conducted two lineups on July 31, 1983. He identified People's Exhibit No. 3 as a photograph of the two lineups in which defendant was a participant. According to Kwilos, Martinez identified defendant as the man he observed with a handgun. Saldivar identified defendant as the man he observed with a handgun in his waistband.

¶ 32    The State next offered evidence with respect to the defendant's whereabouts and/or flight from the police after the incident in 1983. In this regard, it was stipulated that defendant had contact with a North Las Vegas police officer in April of 1996 at which time defendant identified himself as "David Quiroz."

¶ 33    The State then called Chicago police detective Thomas Cepeda, who testified that on July 26, 2006, as part of his duties in the cold case squad, he received a telephone call from an individual identifying himself as the victim's cousin and stating that he had seen his cousin's killer. As a result of this conversation, Cepeda retrieved the cold case file from the police warehouse. After reviewing the file, Cepeda discovered that even though a warrant had been issued for defendant's arrest in 1983 after he skipped bond, there was no outstanding warrant in the computer system. Cepeda learned that defendant's warrant was among those accidentally purged from the circuit court's computer system when the system was upgraded. Cepeda reentered the warrant into the system, and used the system to cross-check names that defendant had used in the past. Cepeda then learned about defendant's three prior arrests in North Las Vegas, as well as his contemporaneous whereabouts.

¶ 34    Cepeda testified that, as a result of this search, he proceeded to defendant's house in Burbank, Illinois, in the early morning hours of January 3, 2007, with the fugitive apprehension team. When defendant walked out of the house, and the officers asked his name, defendant initially gave the police two different names, "Florentine Morado and David Perros," but after he was shown his 1983 Chicago police photograph and asked to identify the person in the photograph, he admitted he was the person in the photograph.

¶ 35    The parties finally stipulated that, if called to testify, Cook County medical examiner Dr. Yuskel Konacki would state that he performed the autopsy on the victim on July 31, 1983, and that the autopsy revealed the victim died as a result of a gunshot wound to the right side of his forehead, and the manner of death was homicide. Konacki would also state that the toxicology report revealed that the victim's blood-alcohol content was 0.249.

¶ 36    On this evidence, the trial court found defendant guilty of the murder of Diego Cisneros.

¶ 37                                Posttrial Proceedings

¶ 38    On April 28, 2008, newly retained attorney Daniel Coyne appeared on behalf of the defendant and filed a motion for judgment of acquittal or, in the alternative, a new trial. In that motion, the defendant claimed, essentially, that the State had failed to prove him guilty beyond a reasonable doubt, and that trial counsel rendered ineffective assistance, without further specification. On July 24, 2008, a third attorney, Stephen Richards, appeared on behalf of the defendant seeking leave to replace Daniel Coyne as defense counsel. After the substitution, Richards filed an amended motion for a new trial adding new contentions. First, the amended motion alleged that the defendant was denied his constitutional right to the effective assistance of trial counsel because: (1) counsel failed to file a motion to dismiss based upon a speedy-trial violation and (2) counsel failed to file, investigate or advise the defendant to testify in support of a defense of self-defense. In addition, the amended motion alleged that the trial court erred "by granting the State's motion *in limine* and allowing the State to use a transcript of a witness's preliminary hearing testimony to convict the defendant."

¶ 39    On August 6, 2008, the defendant filed a *pro se* posttrial motion alleging ineffective assistance of trial counsel on several grounds, including, *inter alia*, (1) that trial counsel failed to properly investigate the case; and (2) that defendant repeatedly told trial counsel he wanted to testify, but trial counsel refused to permit him to do so.

¶ 40    On October 16, 2008, the trial court heard arguments on the posttrial motions. Pertinent, and related, to the issue now before this court, attorney Richards argued, *inter alia*, that the use of the preliminary hearing transcript at trial constituted a "confrontation clause" violation. Richards suggested that attorney Grossman did not have "a full and fair opportunity" to cross-examine Pena at the preliminary hearing because he was "not possessed of the same documents and materials that he would have been possessed [of] at a true trial." The circuit court denied defendant's motions.

¶ 41    On appeal, the defendant argued: (1) the circuit court violated his right to confrontation under the sixth amendment to the United States Constitution by permitting the State to introduce into evidence Pena's preliminary hearing testimony; and (2) he was denied his constitutional right to the effective assistance of counsel when counsel failed to file a motion to dismiss the indictment on the grounds that the defendant was denied his right to a speedy trial.

¶ 42    Citing this court's admonishment in *In re E.H.*, 224 Ill. 2d 172, 179 (2006), that constitutional questions should be addressed only after resolving any threshold issues of admissibility in favor of admission, the appellate court purported to first consider whether

the admission of Pena's preliminary hearing testimony "pass[ed] muster as an evidentiary matter." No. 1-08-3254 (unpublished order under Supreme Court Rule 23). Quoting this court, the appellate court identified the requisites for admission of former testimony: "[T]estimony of a witness at a prior hearing is admissible in evidence at trial where the witness is unavailable and when ample opportunity to cross-examine existed at the prior hearing." (Internal quotation marks omitted.) No. 1-08-3254 (unpublished order under Supreme Court Rule 23) (quoting *People v. Sutherland*, 223 Ill. 2d 187, 273 (2006), quoting *People v. Rice*, 166 Ill. 2d 35, 39 (1995)). After a discussion of this court's precedent, the appellate court concluded attorney Grossman did not have the requisite opportunity to effectively cross-examine Pena at the preliminary hearing and thus Pena's testimony from that hearing should not have been admitted as evidence at trial. The court determined its inability to find the error harmless warranted reversal and remand. The appellate court characterized its holding as merely evidentiary in nature, insisting that it would not reach the merits of defendant's confrontation claim, as it was unnecessary to do so. No. 1-08-3254 (unpublished order under Supreme Court Rule 23).

¶ 43    Though the appellate court's restraint is exemplary, in this instance, the evidentiary and constitutional considerations are not so readily divorced.

¶ 44                                      ANALYSIS

¶ 45    In this appeal, the State, as the appellant, argues that the appellate court "improperly applied the motive and focus test for gauging the sufficiency of defendant's opportunity to cross[-]examine the witness at the preliminary hearing, and in so doing, wrongly held that the former sworn testimony of an unavailable eyewitness was inadmissible at trial." Predictably, the defendant contends that the appellate court "properly applied existing Illinois law" in holding the prior testimony inadmissible.

¶ 46    The parties' disagreement extends to the proper standard of review. The State, quoting *People v. Boclair*, 129 Ill. 2d 458, 476 (1989), submits that "[e]videntiary rulings are within the sound discretion of the trial court and will not be disturbed on review unless the trial court has abused its discretion." Relying upon *People v. Hall*, 195 Ill. 2d 1, 21 (2000) (citing *People v. Williams*, 188 Ill. 2d 365, 369 (1999)), the defendant suggests, where, as here, admissibility turns on a question of law, the standard of review is *de novo.* This court has held that a trial court's ruling on the admission of former testimony is to be reviewed for an abuse of discretion. *Sutherland*, 223 Ill. 2d at 272-73. Under either standard of review, the outcome in this case would be the same.

¶ 47    As a preliminary matter, we note, although the appellate court characterized its analysis and holding as "evidentiary" in nature, an examination of *People v. Tennant*, 65 Ill. 2d 401, 408-12 (1976), and *People v. Horton*, 65 Ill. 2d 413, 415 (1976)—two of this court's seminal cases—and the United States Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36, 57-58 (2004), reveals that constitutional considerations are inextricably intertwined with the question of admissibility.

¶ 48    In *Tennant*, the State was allowed, over defendant's objection, to introduce at trial the preliminary hearing testimony of a witness who had died prior to trial. Like the defendant in

this case, Tennant argued that the State's use of that testimony denied him due process of law and the right, under the federal and state constitutions, to confront witnesses against him. As the deceased witness in *Tennant* was obviously "unavailable" to testify at trial—the first requisite for the admission of former testimony (see *Tennant*, 65 Ill. 2d at 409 (citing 2 Spencer A. Gard, Jones on Evidence § 6:41 (6th ed. 1972))—the *Tennant* court focused on the prior opportunity for cross-examination—the second requirement for admission (*Tennant*, 65 Ill. 2d at 409 (quoting 2 Spencer A. Gard, Jones on Evidence § 6:41 (6th ed. 1972)), and one meant to ensure the right to confrontation as well (see *Tennant*, 65 Ill. 2d at 408 (" 'The main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination.*' " (emphasis in original) (quoting 5 James H. Wigmore, Evidence § 1395 (Chadbourn rev. ed. 1974)).

¶ 49    The *Tennant* court observed that *this* court, as long ago as *Barnett v. People*, 54 Ill. 325 (1870), had upheld the admission at trial of preliminary hearing testimony of a witness who died prior to trial. As noted in *Tennant*, the *Barnett* court rejected " 'the *supposed constitutional objection* *** to such evidence, as the witness was confronted with the accused, and he was afforded an opportunity of cross examination in the examining court.' " (Emphasis added.) *Tennant*, 65 Ill. 2d at 410 (quoting *Barnett*, 54 Ill. at 330). This court, in *Tennant*, observed that no United States Supreme Court decision had held the preliminary hearing testimony of a deceased witness *automatically* admissible "so long as the witness was cross-examined," but it noted there was "persuasive language" in several opinions, citing, *inter alia*, *Mattox v. United States*, 156 U.S. 237, 241 (1895). Just before the *Tennant* court concluded its analysis of the issue, finding that defendant had had an adequate opportunity for cross-examination at the preliminary hearing, and that the testimony therefrom was, consequently, admissible at trial, the court left no doubt as to the significance of the requirement, for admission, of an "adequate opportunity for cross-examination." *Tennant*, 65 Ill. 2d at 411. Quoting from Wigmore, this court observed, " 'if the accused has had the benefit of cross-examination, he has had the very privilege *secured to him by the Constitution.*' " (Emphasis added.) *Tennant*, 65 Ill. 2d at 411 (quoting 5 James H. Wigmore, Evidence § 1397, at 158 (Chadbourn rev. ed. 1974)).

¶ 50    In *Horton*, too, this court was confronted with a contention that the admission of former testimony from a preliminary hearing denied defendants their "constitutional right to confront witnesses." *Horton,* 65 Ill. 2d at 415. At the outset of its analysis, this court acknowledged that the question of "admissibility" necessarily involved a constitutional question when the court quoted, with added emphasis, this tentative assessment from *Barber v. Page*, 390 U.S. 719, 725-26 (1968): " '[T]here may be *some justification* for holding that the opportunity for cross-examination of a witness at a preliminary hearing satisfies the demands of the confrontation clause where the witness is shown to be actually unavailable ***.' " (Emphasis in original.) *Horton*, 65 Ill.2d at 416.

¶ 51    The United States Supreme Court's discussion of former testimony in *Crawford* also makes clear that, in addition to the requirement of unavailability, there is the prerequisite of "an adequate opportunity to cross-examine" (*Crawford*, 541 U.S. at 57) and that requirement has a constitutional genesis. Quoting from *Mattox*—the same case this court referenced in *Tennant*—the Court stated: "The substance of the constitutional protection is preserved to

-10-

the prisoner in the advantage he has once had of seeing the witness face to face, and of subjecting him to the ordeal of cross-examination. This, the law says, he shall under no circumstances be deprived of ... .' " *Crawford*, 541 U.S. at 57 (quoting *Mattox*, 156 U.S. at 244). The Court summarized its discussion of precedent with this observation: "Our cases have thus remained faithful to the Framers' understanding: Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford*, 541 U.S. at 59.

¶ 52    Clearly, as this court and the Supreme Court have recognized, the requirement of a prior, "adequate opportunity to cross-examine" the absent witness is at once both an evidentiary and *constitutional* requisite for admission of former testimony. This is not, as the appellate court suggests, strictly an evidentiary matter. With that clarification, we address the question of whether Pena's preliminary hearing testimony was properly admitted, given the facts of this case.

¶ 53    As noted, the requirements for admission of former testimony are twofold: the witness from the prior hearing must be unavailable at trial and the defendant must have had an adequate opportunity to effectively cross-examine the witness at the prior hearing. *Sutherland*, 223 Ill. 2d at 273; *Rice*, 166 Ill. 2d at 41. These are time-honored requisites for admission. See *Crawford*, 541 U.S. at 53-54 ("[T]he Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination. The text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts."). As this court and the Supreme Court have recognized, prior testimony from a *preliminary hearing* may be admissible at a subsequent trial so long as the two requirements for admission are met. See *Tennant*, 65 Ill. 2d at 411; *Horton*, 65 Ill. 2d at 417; *Crawford*, 541 U.S. at 58 (citing approvingly *Ohio v. Roberts*, 448 U.S. 56 (1980), overruled on other grounds by *Crawford*). This court has indicated that determination is undertaken on a case-by-case basis. *Sutherland*, 223 Ill. 2d at 273; *Horton*, 65 Ill. 2d at 416. As in any other instance, the proponent of evidence bears the burden of proving the necessary elements for admissibility. See *People v. Cookson*, 215 Ill. 2d 194, 204 (2005).

¶ 54    "Unavailability," the first requirement for admission, has been described by this court as "a narrow concept, subject to a rigorous standard." *People v. Johnson*, 118 Ill. 2d 501, 509 (1987). "[T]he prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." (Internal quotation marks omitted.) *People v. Bowen*, 183 Ill. 2d 103, 118 (1998) (quoting *Idaho v. Wright*, 497 U.S. 805, 814 (1990), quoting *Roberts*, 448 U.S. at 65). In *Roberts*, the Supreme Court explained:

> "The basic litmus of Sixth Amendment unavailability is established: '[A] witness is not "unavailable" for purposes of ... the exception to the confrontation requirement unless the prosecutorial authorities have made a *good-faith effort* to obtain his presence at trial.' " (Emphasis in original.) *Roberts*, 448 U.S. at 74 (quoting *Barber*, 390 U.S. at 724-25).

The Court continued:

> "Although it might be said that the Court's prior cases provide no further refinement of this statement of the rule, certain general propositions safely emerge. The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness' intervening death), 'good faith' demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation. 'The lengths to which the prosecution must go to produce a witness ... is a question of reasonableness.' [Citation.] The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness. As with other evidentiary proponents, the prosecution bears the burden of establishing this predicate." (Emphasis added.) *Roberts*, 448 U.S. at 74-75.

¶ 55    In this case, the State *alleged*, in its motion *in limine*, that Pena was no longer available to testify because he had been deported to Mexico in 1984. In defendant's response to the State's motion, he, too, states that Pena was deported to Mexico. The State presented no evidence in support of that allegation. The reason for, and circumstances surrounding, Pena's deportation—assuming he was in fact deported—are not explained in the record. The appellate court does describe Pena as an "illegal" alien, but we find nothing in the record to substantiate that status. We note, the fact of deportation does not necessarily establish that Pena was an "illegal" alien, because even a "legal" alien may be subject to deportation. See generally *People v. Huante*, 143 Ill. 2d 61, 64 (1991). However, at this juncture, only the fact of deportation would have been indisputably significant, though evidence of what the prosecution might, or might not, have done to secure the witness' presence at defendant's trial might also have been relevant, had the defendant actually contested the element of unavailability at trial. As the California Supreme Court's well-reasoned and scholarly opinion in *People v. Herrera*, 232 P.3d 710, 716-21 (Cal. 2010), amply demonstrates, simply establishing the fact of deportation, in support of unavailability, may no longer be enough to establish that requisite for admission. See also *United States v. Yida*, 498 F.3d 945, 952-61 (9th Cir. 2007).

¶ 56    In any event, that question is academic as far as this case is concerned. We view the parties' agreement regarding Pena's 1984 deportation as the equivalent of a stipulation to that fact. A stipulation has been defined as "[a] voluntary agreement between opposing parties concerning some relevant point." Black's Law Dictionary 1550 (9th ed. 2009). Apart from that, whether the State took reasonable steps in an attempt to procure Pena's attendance at trial, or whether it was obligated to do anything at all, are not matters properly before us, as the defense appears to have conceded, throughout these proceedings, that the first requirement for admission—unavailability of the witness—is met. If not conceded, the defense has forfeited any challenge to admission on the basis of unavailability. In his response to the State's motion *in limine*, the defendant recognized that the State was required to "establish [the] witness is unavailable," to show "diligent good faith to procure the witness," and to demonstrate that "the accused had ample opportunity to cross-examine the witness" at the preliminary hearing. Defendant concluded that "[t]he state may be able to

satisfy the first two prongs but it fails miserably in satisfying the third prong." If not a concession with respect to the first two prongs of proof, defendant's failure to challenge admission on the basis of unavailability qualifies as forfeiture. See *People v. Woods*, 214 Ill. 2d 455, 470-75 (2005); *People v. Akis*, 63 Ill. 2d 296, 299 (1976).

¶ 57 Thus, we consider whether the second requirement for admission of Pena's preliminary hearing testimony is met, *i.e.*, whether defendant had an adequate opportunity to cross-examine Pena at that hearing.

¶ 58 In *Rice* and *Sutherland*, in the course of considering whether an adequate opportunity existed for cross-examination of the witness at the prior proceeding, this court looked, *inter alia*, to the "motive and focus" of the examination conducted at the first proceeding, and that which would have been conducted at the second. In *Sutherland*, this court quoted from *Rice*:

> "For an opportunity to cross-examine to be considered meaningful, and therefore adequate and effective, the motive and focus of the cross-examination at the time of the initial proceeding must be the same or similar to that which guides the cross-examination during the subsequent proceeding." *Sutherland*, 223 Ill. 2d at 273 (quoting *Rice*, 166 Ill. 2d at 41).

¶ 59 The State argues that defense counsel's cross-examination of Pena at the preliminary hearing partook of the same "motive and focus" as would a similar cross-examination at trial. We agree. In each instance, the focus of questioning is whether the evidence supports a finding that the defendant committed the charged crime. To the extent a witness testifies to facts supporting such a finding, the defense has a motive in questioning that witness to test the witness' credibility, powers of observation, and recall, and, if possible, undermine that testimony in the eyes of the factfinder.

¶ 60 However, the motive-and-focus test cannot be our *sole* guide to a resolution in this instance. It could be in *Sutherland* because the witness in that case was "subject to unlimited cross-examination" at the first trial, by which time defendant had full discovery, and the motive and focus in one trial was clearly the same as that in the other trial. See *Sutherland*, 223 Ill. 2d at 273. It could be in *Rice* because the motive and focus of the State's questioning of Rice's codefendant at the *suppression hearing* was so obviously *not* the same as it would have been at *trial*. As this court explained:

> "In the present case, the question presented at codefendant's suppression hearing dealt with whether Officer Drozd saw codefendant tuck a brown paper bag into his pants after defendant's car was stopped, giving the officer probable cause to search codefendant. The focus of the cross-examination of codefendant at the suppression hearing therefore was the conduct of codefendant just prior to the search, his self-interest in testifying falsely at the suppression hearing, and the issues presented by the motion to suppress. At trial however, the State's focus would be on the guilt or innocence of defendant—a much different issue than that presented at the suppression hearing—and any motive codefendant might have in making exculpatory statements on behalf of defendant. The issues at the suppression hearing and the purpose for which codefendant's testimony was later offered at defendant's trial are not so similar that we may say that the State had a meaningful opportunity to

effectively cross-examine codefendant on the occasion his testimony was given." *Rice*, 166 Ill. 2d at 41-42.

Though motive and focus have been identified as pertinent considerations by this court, two other factors have also been cited as relevant to the question of admission.

¶ 61 We have already alluded to one pertinent consideration when we observed that the defendant in *Sutherland* had the benefit of "unlimited cross-examination" at the prior proceeding. *Sutherland*, 223 Ill. 2d at 273; see also *Tennant*, 65 Ill. 2d at 404 (the witness at the preliminary hearing "had been cross-examined by counsel for defendant without limitation"). Fairness, and indeed defendant's right to confrontation, demand an opportunity for adequate cross-examination of the witness at the preliminary hearing if that testimony is to be subsequently admitted against the defendant at trial.

¶ 62 Beyond the freedom to fully question the witness regarding critical areas of observation and recall, to test him for any bias and prejudice, and to otherwise probe for matters affecting his credibility, what counsel *knows* while conducting the cross-examination may, in a given case, impact counsel's ability and opportunity to effectively cross-examine the witness at the prior hearing. This court suggested as much in *Horton*:

> "In the absence of discovery procedures and in view of the limited nature of the evidence which may be introduced at a preliminary hearing, the question whether adequate opportunity to cross-examine had existed at the preliminary hearing (see *People v. Tennant*, 65 Ill. 2d 401) may not depend in its entirety on what transpired at that hearing. Adequate opportunity to cross-examine means an opportunity to effectively cross-examine, and merely providing an opportunity to cross-examine at the preliminary hearing is not *per se* adequate opportunity." *Horton*, 65 Ill. 2d at 417.

Pertinent to that inquiry, this court went on to observe that the prior testimony of the unavailable witness was cumulative of the testimony of other witnesses, and noted, "[d]efendants have not suggested, nor do we perceive, in what manner additional cross-examination would benefit them." *Horton*, 65 Ill. 2d at 417.

¶ 63 This defendant has. It is apparently undisputed that defense counsel, at the preliminary hearing, was not privy to the inconsistent statements Pena gave to police, statements that counsel might have used to confront Pena and see if further changes in Pena's version of events might be forthcoming. In addition, counsel apparently did not know about Pena's status as an alien, or the circumstances of his departure from this country. Defendant suggests—and we agree—that the looming threat of deportation might have furnished a formidable incentive for Pena to curry favor with the State. Moreover, Pena's testimony was not cumulative of any other witnesses; only his testimony placed defendant in the bar at the time of the shooting.

¶ 64 In conjunction with the foregoing circumstances, we consider the restrictions—overt and covert—on defense counsel's cross-examination of Pena. In this regard, we believe the remarks made by the court prior to the commencement of the hearing are relevant insofar as they evince the atmosphere in which counsel's cross-examination was conducted. It is clear from these remarks that the court was not enthusiastic about proceeding immediately with the preliminary hearing, a fact of which defense counsel must have been aware. In that

context, during the course of counsel's cross-examination of Pena, the trial court sustained two objections. The first objection was sustained when defense counsel attempted to inquire whether Pena knew the victim's father. Although the court told defense counsel he could "go ahead" when counsel explained he was "going to go into bias or prejudice," after counsel received the answer to that question, counsel abandoned that line of inquiry altogether and never asked another question designed to probe for possible bias or prejudice. It seems unlikely that counsel could formulate no more questions in that vein. When the second objection was sustained, defense counsel became argumentative with the court, asking: "How is that objectionable?" The court's curt response—"Sustained"—seems to have sent the message to counsel to wrap it up, and counsel did just that. We think it is clear from the record that counsel would have done more with the witness at the preliminary hearing if he had felt free to do so. Viewing the cross-examination in its totality, we cannot say that counsel was afforded an adequate opportunity to cross-examine Pena.

¶ 65    In view of these limitations and the pertinent information of which counsel was not apprised, we believe the circuit court erred in allowing admission of Pena's preliminary hearing testimony. Like the appellate court, we are unable to say this error was harmless, as Pena's testimony was the only trial evidence to put defendant in the bar at or near the time of the shooting.

¶ 66    As we noted in *Horton*, a preliminary hearing is not intended to be a discovery proceeding; however, for the preliminary hearing testimony of an unavailable witness to be subsequently admissible at trial, the trial court must have allowed defense counsel to fully explore the highly relevant areas of the witness' opportunity to observe, interest, bias, prejudice, and motive. While defense counsel may not, at that stage, have all the information at his or her disposal that discovery may later disclose, if the preliminary hearing testimony is to be admissible at trial, defense counsel must have had a fair opportunity to effectively inquire into those areas. Lacking that, it is error to admit such testimony at trial, and it is prejudicial error if it would affect the outcome of the trial.

¶ 67    For the foregoing reasons, we affirm the judgment of the appellate court.

¶ 68    Affirmed.

-15-