2016 IL App (1st) 141196
No. 1-14-1196
Opinion filed March 1, 2016

Second Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 06 CR 24436 |
| WAYNE WEINKE, | ) ) | The Honorable Kay Hanlon and |
| Defendant-Appellant. | ) ) | William G. Lacy, Judges, presiding. |

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Presiding Justice Pierce and Justice Neville concurred in the judgment and opinion.

OPINION

¶ 1     On the evening of Tuesday, July 18, 2006, Gloria Weinke, 77, was found at the bottom of her basement stairs. Gloria told police and paramedics that her son Wayne Weinke pushed her over a first-floor railing, causing her to fall to the basement. This happened in the early morning hours, and upwards of 12 hours passed before a security guard found her.

¶ 2     The State immediately asked to take an evidence deposition to preserve Gloria's testimony, even though defense counsel had just entered the case. The trial court granted permission over Weinke's objection, having been presented nothing other than statements by a prosecutor. About three months later, Gloria, who was battling the effects of metastatic cancer,

died. Six years passed, and Weinke's case went to a bench trial at which Gloria's deposition testimony was admitted into evidence.

¶ 3        Weinke alleges that in granting the evidence deposition and in admitting the deposition. the trial court violated his constitutional right to confront witnesses. The State contends that it provided evidence to the trial court by way of proffer to establish that, under Illinois Supreme Court Rule 414, there was a "substantial possibility" that Gloria would be unavailable for trial. But what the State characterizes as a "proffer," is not a proffer at all, nor did the State submit an evidentiary predicate of any kind.  Indeed, what the State presented was unsupported argument, that's it. We hold that, as a matter of law, allowing Gloria's evidence deposition to be taken on an emergency basis constitutes reversible error.  Separately and alternatively, we hold that admitting the deposition at trial violated Weinke's constitutional rights because his counsel did not have an adequate opportunity to cross-examine Gloria at the deposition.

¶ 4        A second issue involves the prosecutor repeatedly asking Weinke during cross-examination whether Gloria and other witnesses had lied. Weinke submits that these cross-examination questions were improper.  Weinke did not raise this issue in his post-trial motion; and thus, it is reviewable only for plain error.  But, Weinke also failed to address the plain error standard in his briefs; consequently, we will not review the merits of this claim.

¶ 5        There is one other matter that we address—the representations made by a Cook County Assistant State's Attorney at the hearing on the evidence deposition. As later revealed, the Assistant State's Attorney representations regarding Gloria's injuries, condition, and prognosis were false, misleading or unsupported.  While we have no desire to impugn the ASA's reputation, given the power and autonomy that prosecutors have over a criminal defendant's fate,

we cannot ignore what happened. Conduct of this sort is incompatible with the truth-seeking process and harms the integrity of the criminal justice sytem.

¶ 6                                                  BACKGROUND

¶ 7         On the morning of Thursday, July 20, 2006, Weinke first appeared in court, and a prosecutor asked for permission to conduct a video deposition to preserve Gloria's testimony. The prosecutor told the court that Gloria had suffered "critical" injuries, including a fractured pelvis, head injuries, a collapsed lung, and abdominal trauma, and stated that it was "unclear" whether Gloria would survive. Weinke's counsel objected to the request; the case was held over until the next day "based on the State's representation to me that the victim in this case may very well not make it."

¶ 8         On the morning of Friday, July 21, Assistant State's Attorney Karen Crothers filed a written motion under Illinois Supreme Court Rule 414 (eff. Oct. 1, 1971) requesting that the video deposition be taken that afternoon based on the "substantial possibility" that Gloria would be unavailable for trial. The motion did not include any details or documentation.

¶ 9         In court, Crothers reported that doctors would perform surgery on Gloria's fractured pelvis the following Monday, and had not been scheduled sooner because Gloria's injuries— including a closed-head injury and a fractured spine—were so extensive that Gloria's condition needed to stabilize before the surgery could be performed. Weinke's counsel (a different attorney than the one who appeared the day before) objected, arguing that the State had not provided any evidence of Gloria's condition, and that he could not properly cross-examine Gloria that day because counsel had not received Gloria's medical records and did not know whether Gloria was being medicated, which might affect her ability to testify.

¶ 10        Crothers pressed the issue, stating that Gloria might not survive the upcoming surgery, based on "our review of the medical records and speaking to the physicians who have been treating her." The motion judge asked Crothers whether those medical records had been tendered to the defense; Crothers then stated that the State did not have the medical records, but "this is information that has been gleaned from the treating physicians" at the two hospitals that had treated Gloria since her fall.

¶ 11        Based on the relevance of Gloria's testimony, her age, her injuries, and her history of cancer, the motion judge allowed the deposition to take place at 2:00 p.m. Defense counsel requested a postponement as he had no time to prepare. Crothers stated that the deposition had to be that day due to the surgery set for Monday.

¶ 12        The motion judge inquired about Gloria's mental condition. Crothers stated: "We did speak to the hospital personnel. We informed them of the possibility of this happening today at Lutheran General [Hospital]. They indicated to us that they believe that her condition was such that they could minimize pain medication so that she would be lucid and able to give her testimony and that she would be able to give both parties a chance to elicit testimony in this matter." The court again asked whether Gloria's condition was so critical that she might not survive until Monday, and Crothers responded: "I think that's quite possible, your Honor. Every day, she is declining in her condition. She has a collapsed lung, that is a recent development."

¶ 13        Defense counsel again asked that the deposition be postponed. The court stated that it was granting the deposition based on the State's representation that the severity of Gloria's condition might make a delay of even a few days too long. The court ordered the State to immediately tender discovery, including photographs of Gloria's home (where she alleged

Weinke attacked her). Two hours before the deposition, defense counsel was still in court and had been tendered a considerable number of documents, including poor copies of photographs.

¶ 14    The deposition began at 2:24 p.m. with Gloria sitting propped up in her hospital bed. Gloria related her name, age, and address, as well as the names of her children and the family company, Way-Ken Contractor's Supply, where she worked part-time. Gloria explained that her relationship with Weinke had been fine until she and her husband, Wayne Sr., who had died in March 2006, made a change to their estate plan. The original will divided their property equally between Weinke, their other son, Ken, and daughter Gail. Gloria and her husband had decided to put the property on which the family business operated in a separate trust for Gail. Weinke and Ken had operated the business since Wayne Sr.'s retirement. Gloria and Wayne Sr. intended that Weinke and Ken should pay Gail rent to operate the business on the property.

¶ 15    After Weinke discovered this change in the estate plan, his relationship with Gloria deteriorated. Both Weinke and Ken would argue with Gloria about this new plan and threatened to sue her. Weinke contacted Gloria's friends and minister about the disagreement. At the end of May 2006, Gloria met with Weinke at the office of her attorney to discuss the estate plan. During the meeting, Weinke went "ballistic," and Gloria repeated what her sister, present at the meeting, told her—she had never seen anyone so out of control.

¶ 16    Gloria testified that at about 4:45 a.m. on July 18, she was awakened by Weinke ringing her doorbell. This was an unusual time for him to visit. When she allowed him inside, Weinke said, "we need to talk." The two moved into the living room and spoke about an upcoming family reunion. Gloria went into the bathroom, then her bedroom, and then told Weinke that the two of them needed to "straighten this other mess out," referring to the inheritance. Weinke responded that they needed to "talk some more."

¶ 17       As Gloria moved toward the living room, she passed by a railing separating the first floor hallway from the basement below. Suddenly Weinke picked her up and threw her over the railing into the basement. She did not remember hitting the basement stairs. Weinke turned on the light switch and looked down at her; Gloria asked him to press an emergency call button located on the wall, but instead Weinke turned off the light and left her there. She attempted to stay awake the entire time, but occasionally fell asleep. She lay there until that evening when a security guard for the retirement community in which she lived found her.

¶ 18       On cross-examination, defense counsel questioned Gloria about her cancer, her previous conversations with Weinke, the estate arrangements, and her role at the family business.

¶ 19       Gloria died on October 2, 2006. Before Weinke's trial, the State moved to admit Gloria's deposition into evidence under 725 ILCS 5/115-10.4 (West 2006). Weinke objected, arguing that the State failed to comply with Illinois Court Rules in obtaining the deposition, and the lack of notice before the deposition deprived Weinke an opportunity to effectively cross-examine Gloria. Weinke alleged that ASA Crothers had provided Judge Hanlon inaccurate information about Gloria's injuries and condition, persuading the court to grant the deposition on short notice. As support, Weinke submitted some of Gloria's medical records.

¶ 20       This inaccurate information fell into several categories. First, Crothers had told the trial court that Gloria had suffered "multiple fractures to her pelvis, a closed-head injury, a fractured spine, a collapsed lung, and extensive abdominal trauma." But her July 21 medical records from Lutheran General Hospital, where she was transferred on July 20, contain nothing about a closed-head injury, a fractured spine, or abdominal trauma. And her collapsed lung, according to the medical records, was a chronic condition.

¶ 21    Second, Crothers told the trial court that Gloria's condition was "unstable," and that the deposition could not be delayed because it was "quite possible" she would not survive until Monday, as she was declining "every day."  But when Crothers made these statements on July 21, Gloria had already been transferred to Lutheran General Hospital in stable condition, and her medical records from that time do not even hint she was in any imminent danger of dying.

¶ 22    Third, Crothers stated multiple times that "we" (presumably meaning the State's entire team, including other prosecutors and police officers) had gathered this information from Gloria's treating physicians. In fact, neither ASA Crothers, other prosecutors on the case, or the investigating police officers had ever spoken to Gloria's physicians about her condition.  The information about Gloria's condition came to Crothers fourth-hand: Crothers had read police reports generated by detectives, who had spoken to Gloria's daughter Gail and an unnamed hospital nurse, who had presumably spoken to Gloria's doctors. The injuries raised by Crothers and those in the police report are consistent with the initial evaluation of Gloria's possible injuries by the Northwest Community Hospital emergency room on July 19. By the time Crothers was in court on July 21, most of these injuries had been ruled out on further examination.

¶ 23    Fourth, Crothers stated that Gloria's pain medication was being minimized to prepare her for the deposition. The State provided no documentation, and none appears in the record, detailing what pain medication Gloria had been receiving and how it had been titrated to allow for lucid testimony. Crothers stated that "we" spoke to "hospital personnel" about this issue, but again, no one from the State's team actually spoke to Gloria's doctors.

¶ 24    Defense counsel asked for an evidentiary hearing to explore whether the information Crothers gave the motion judge, Judge Hanlon, was accurate and honest, but Judge Lacy,  before

whom the case was tried, denied the request. After hearing argument, Judge Lacy granted the State's motion to admit the deposition, finding that the State had complied with Illinois Court Rules and that the decision to allow the deposition was justified based on Gloria's age, cancer diagnosis, and impending surgery. Judge Lacy did not address Crothers' false statements, and stated that even if the misinformation were purposefully given, it would not change the conclusion that the undisputed facts justified the deposition.

¶ 25    At Weinke's bench trial, the State presented Gloria's deposition as evidence. The security guard who found Gloria in her home, a paramedic who brought her to the hospital and police officers testified that Gloria had told them Weinke threw her into the basement. Gloria's personal attorney explained the changes in the family estate plan and described a meeting where Weinke, upset over the plan's preferential treatment of Gail, called Gloria a "f--king bitch." Expert witnesses opined that the blood spatter pattern in the basement, and Gloria's specific injuries, indicated that Gloria had been thrown from the first floor. The medical examiner testified that Gloria had been suffering from metastatic cancer, but her death had been caused by her injuries. Finally, police officers testified that Weinke was interviewed the day after the incident and told them that he needed to apologize to his mother because "if I did this, I don't remember, but it sounds like I did it."

¶ 26    Weinke denied making this statement to police. He testified that he had been at the home a few days before Gloria's fall, where they had a friendly conversation. He denied ever hurting her. He stated that he had been angry at his mother about the estate plan, but that he had been trying to convince her to change the plan and optimistic that she would do so. On cross-examination, the prosecutor asked Weinke three times whether he was calling his mother a liar. Defense counsel's objections were overruled and the trial court instructed Weinke to answer the

question "just yes or no." The prosecutor later asked Weinke whether his son lied about Weinke's work schedule, and the trial court sustained Weinke's objection. The prosecutor asked whether a police officer lied about Weinke's statement and that objection was overruled. The prosecutor asked whether state witnesses lied about Gloria's statements implicating Weinke, and again, his objection was overruled.

¶ 27 Weinke presented doctors who opined that Gloria had actually died from her metastatic cancer, her death had not been caused by her injuries, and she may have been suffering from Alzheimer's disease. A friend of Gail's testified that Gail had been concerned about Gloria's safety around the basement stairs, and two of Gloria's friends testified that her memory had recently begun to deteriorate and she was acting confused.

¶ 28 The trial court convicted Weinke of first-degree murder. The trial court found Gloria's video deposition testimony persuasive and noted Weinke's motive and anger towards Gloria. The trial court found his statement to police "nothing short of damning." The court credited the State's expert medical witnesses that Gloria had died from her injuries. Weinke received a sentence of 40 years imprisonment.

¶ 29 ANALYSIS

¶ 30 Gloria's Deposition

¶ 31 Weinke challenges the admission of Gloria's deposition on several grounds. First, he argues that the State violated Illinois Supreme Court Rules because its written request for the deposition was insufficient. Second, he argues that the Rule 414 motion should have been denied. Finally, he challenges admission of the deposition at trial as violating his constitutional right to confront witnesses against him.

¶ 32 Violations of Illinois Court Rules

¶ 33    Weinke argues that the State violated Illinois Supreme Court Rule 217 (eff. July 1, 1982) based on the factual insufficiency of its written request for the evidence deposition. That rule allows for the taking of depositions in civil cases to preserve testimony. *Adams v. Northern Illinois Gas Co.*, 333 Ill. App. 3d 215, 224 (2002). A motion under Rule 217(a)(1) must specify what facts the party wishes to establish through the deposition.

¶ 34    The State responds that it requested the evidence deposition under Rule 414, which allows for preservation of testimony in criminal cases and requires only a motion and notice to both parties. Weinke responds that under Rule 414(b), "the taking of depositions" follows the rules for the taking of depositions in civil cases, and this section makes Rule 217 applicable to the State's request for Gloria's deposition.

¶ 35    We agree with the State. Rule 414 governs this criminal case. Rule 414 does not require the State to specify what facts it wishes to establish in its motion as in a civil case. The language of Rule 414(b), stating that the deposition shall be taken in accordance with the civil rules, refers to the rules covering the deposition itself, not the preliminary decision of whether to allow the deposition. A contrary interpretation would subject the issue to two inconsistent procedures. Like statutes, we examine and interpret rules as a whole and avoid absurdity. *In re Shelby R.*, 2013 IL 114994, ¶ 32.

¶ 36    *People v. Brown*, 374 Ill. App. 3d 726, 734 (2007), does not change the conclusion. As the State correctly notes, the "prior testimony" in *Brown* occurred at a bond hearing, not a deposition, and *Brown*'s reference to Rule 217 governing the bond hearing was dicta. Here, all parties considered Gloria's deposition as just that; there was no attempt to transform non-deposition testimony into an evidence deposition after the fact.

¶ 37    We note that Rule 414 does not require that the petition be verified, while Rule 217, which governs depositions to perpetuate testimony in civil cases, does require a verified petition. Ill. S. Ct. R. 217 (eff. July 1, 1982). Given the central role an evidence deposition can play in a criminal case, Rule 414 would benefit from the inclusion of a verification requirement as well. A verified petition would afford the court an additional basis from which it could determine the reliability, accuracy, and credibility of the representations made in support of the petition. And, especially in an emergency situation, it would add specificity and factual support to what otherwise might be suppositions based on unfounded hearsay, which is what we have here.

¶ 38    The State also argues that this issue is unreviewable because Weinke did not raise the argument in his posttrial motion. The motion did challenge the procedures by which the court granted the taking of the deposition, though it did not cite a specific rule. Because we hold that the State did not violate Illinois Court Rules, we need not determine whether the posttrial motion raised this claim.

¶ 39                    Decision to Allow Deposition

¶ 40    We next consider whether granting the Rule 414 emergency motion for the evidence deposition was justified. We hold that, as a matter of law, the State did not meet its burden under the rule. The movant must provide the court with evidence that the deposition is "necessary" because of a "substantial possibility" the witness will be unavailable at trial. Ill. S. Ct. R. 414 (eff. Oct. 1, 1971).

¶ 41    The State's written motion requesting Gloria's deposition was perfunctory, cursory, and without any supporting documentation. Instead, to support its motion, the ASA spoke about Gloria's purported injuries and medical condition. In its brief, the State characterizes this information as a "proffer," but it was not. A proffer is used to convince a trial court to admit

evidence, and must apprise the trial court "what the offered evidence is or what the expected testimony will be, by whom it will be presented and its purpose." *Kim v. Mercedes-Benz, U.S.A., Inc.*, 353 Ill. App. 3d 444, 451 (2004). The State offered no evidence; but rather, invoked a factual argument to stand as evidence. That just does not work.

¶ 42    Setting aside that much of this so-called proffer was false (which we discuss later), we hold that, even if all the information given to the court had been accurate, allowing the deposition without the prosecution introducing any evidence was error. While Rule 414 does not specify the threshold of evidence needed to meet the movant's burden, the State provided not a scintilla of evidence showing that the deposition was "necessary" or that there was a "substantial possibility" that Gloria would be unavailable at trial.

¶ 43    As for the argument itself, the State effectively said, "trust me," repeating hearsay and double hearsay as if it were reliable evidence. Nothing in the argument about Gloria's injuries or condition relied on Crothers's personal knowledge or observation; instead, she purported to relay information from Gloria's medical records (without providing those records to the court or to the defense) or  from Gloria's doctors (without even naming those doctors or  personally or through another ASA talking to them). This does nothing to carry the State's burden under Rule 414. For example, the State did not present one of the doctors via telephonic testimony, secure an affidavit from a physician explaining Gloria's condition, or provide medical records. Weinke's counsel repeatedly asked for proof of this kind, and considering the burden on the State and the implications on Weinke's constitutional rights, the court had every reason to insist, and should have insisted, on something more than the bare oral statement of the assistant State's Attorney.

¶ 44    As the victim and the only witness to Weinke's alleged actions, Gloria's testimony formed the centerpiece of the State's case. And it could not have been more self-evident that her

testimony would have a decisive impact on the course of Weinke's trial, which it did. The State's urgency, however, should have been a signal to subject the State's request to penetrative scrutiny. Describing the situation as an emergency does not excuse the court from hearing, in addition to factual evidence for allowing the evidence deposition, factual evidence of the emergency. This is particularly true when proceeding with the evidence deposition as an emergency thrusts defense counsel into cross-examining on the fly, an untenable situation for both the accused and his or her counsel.

¶ 45 Weinke's first attorney initially appeared in court on Thursday, July 20; a different attorney appeared the next morning, and was immediately confronted with a request for a deposition to be taken in a few hours. The record shows that as little as two hours before the deposition's scheduled start, defense counsel remained at the courthouse receiving a trove of discovery materials from the State.

¶ 46 Under normal circumstances, Weinke's counsel would have been able to investigate the case and develop evidence to contradict the State's representations about Gloria's condition and the necessity of an immediate deposition. But, Weinke's counsel had virtually no opportunity to fulfill this necessary adversarial function. Defense counsel had insufficient time to carry out even a brief investigation of Gloria's medical condition, speak to her doctors, visit the crime scene, and review the discovery materials so that Weinke's opportunity to confront his accuser would be meaningful.

¶ 47 As stated, the court erred in granting the deposition based on the information it had before it. Nevertheless, much of that information was false, misleading, or both. Had the court ordered or directed the State to substantiate its oral statements, it would have learned that Gloria

was not, in fact, declining "every day," and that her injuries were not as severe as Crothers told the court.

¶ 48    The State argues that the facts relayed by Crothers were accurate based on what Crothers knew at the time from reading the police reports (her only source of information about Gloria's condition). This fails to address the point: Crothers did not just recite facts from the police reports; she exaggerated the severity of Gloria's condition and misled the court as to the source and time of her information.

¶ 49    Crothers told the court that the State had spoken to Gloria's doctors about her injuries, her likelihood of survival, and Gloria's ability to testify clearly at the deposition. It was not until well after the deposition that the State admitted to the judge who tried the case that neither Crothers, nor any other prosecutor, had ever spoken to any of Gloria's treating physicians. It appears that the police officers never spoke to any physicians either; instead the information apparently came by way of an anonymous nurse or Gloria's daughter, with whom Weinke was feuding.

¶ 50    While Gloria's severe pelvic fracture was later confirmed, there is nothing in the medical records indicating Gloria's medication status at the time of the deposition. Certainly, if her pain medication had been adjusted for her to testify, we would expect that to be documented.

¶ 51    Further, the medical records flatly contradict many of Crothers' statements, including that Gloria had a fractured spine and a closed-head injury. These records show that Gloria's physicians had examined her and determined the severity of her injuries before Crothers went into court on July 21. Had Crothers (or any of the State prosecutors) actually spoken to her doctors, she could have given the court an accurate picture of Gloria's condition. Crothers's information about Gloria's injuries was gathered by police at one moment in her care; however,

as our previous references to Gloria's medical records show, her condition was changing by the day. Certainly, when the court postponed the hearing on the State's motion from July 20 to July 21, Crothers had the opportunity to update her information.

¶ 52    Finally, there is absolutely nothing in the medical records indicating that Gloria was "every day, declining in her condition," necessitating an immediate deposition. Nor do the police reports indicate that Gloria was on the verge of death. We are left wondering whether Crothers violated her duty of candor toward the tribunal. Ill. R. Prof. Cond. 3.3(a)(1) (eff. Jan. 1, 2010) (attorney shall not knowingly make false statement of fact or law or fail to correct false statement of material fact or law previously made to tribunal by attorney). At oral argument, the State characterized this statement as misinformation given "inadvertently." We do not buy this after-the-fact excuse—nothing in the record suggests it. Moreover, inadvertence is a flimsy excuse, especially where the confrontation clause applies.

¶ 53    In these circumstances—where the State is making an extraordinary request and Weinke's counsel is at an extraordinary disadvantage—granting the deposition without proof was reversible error.

¶ 54    Finally, we must note an egregious example of selective quoting in the State's brief regarding its argument that the "proffer" was accurate. The State supplies a block-quote of a portion of Crothers's argument to the trial court. Conveniently, the State fails to refer to or discuss the remainder of Crothers's statements — the portions we have discussed—that are false, misleading, or unsupported. The statement of facts in the State's brief does not even mention Crothers's exchanges with the trial court. A brief cannot be relied on if it refuses to acknowledge the full factual background. See Ill. Sup. Ct. R. 341(h)(6) (eff. Jan. 1, 1970) (statement of facts should include facts necessary to understanding of case, "stated accurately and fairly without

argument or comment"). As the English novelist, Aldous Huxley, observed, "Facts do not cease to exist because they are ignored." Huxley, *Proper Studies: Notes on Dogma*, 1927.

¶ 55                    Weinke's Constitutional Right to Confront Witnesses

¶ 56       Even if the trial court had not erred in allowing the deposition, in the alternative, we consider whether Weinke's constitutional right to confront witnesses against him was violated. We hold that admission of Gloria's deposition at trial was error under the federal and Illinois constitutions.

¶ 57       "A criminal defendant's right to confront the witness used against him or her is protected by the confrontation clauses contained in both the federal constitution, by the sixth amendment, made applicable to the state through the fourteenth amendment, and the Illinois Constitution." *People v. Hood,* 2014 IL App (1st) 113534, ¶ 17. A trial court may admit preexisting testimony of a witness if the witness is unavailable at trial and the defendant had an adequate opportunity to effectively cross-examine the witness when the testimony was given. *People v. Torres,* 2012 IL 111302, ¶ 53 (quoting *Crawford v. Washington,* 541 U.S. 36, 53-54 (2004)). We make the determination on a case-by-case basis. *Torres,* 2012 IL 111302, ¶ 53 (citing *People v. Sutherland,* 223 Ill. 2d 187, 273 (2006)). This requirement is more than an evidentiary issue; it has constitutional underpinnings in the right to confront adverse witnesses. *Torres,* 2012 IL 111302, ¶ 52. Given that Gloria had died by the time the trial began, the first requirement has been met.

¶ 58       To determine whether Weinke had an adequate opportunity to cross-examine Gloria, we must examine whether the "motive and focus" of the cross-examination at the deposition was the same as it would have been at trial, whether Weinke's cross-examination was unlimited, and what counsel knew when conducting the cross-examination. *Id*. ¶¶ 58, 61-62.

¶ 59   The second consideration—limits on Weinke's cross-examination—favors admission. Unlike in *Torres*, the trial court did not impose restrictions on the length or subject of the cross-examination. *Torres*, 2012 IL 111302, ¶ 64.

¶ 60   As to the motive of the deposition, it was the same as at the eventual trial—to question Gloria's accusation that Weinke had thrown her over a railing. But, not so regarding focus. *Id*. ¶ 59 (focus of questioning concerns whether evidence supports defendant's guilt and motive involves testing the witness's credibility, powers of observation, and recall). While defense counsel understood that he should use his cross-examination to test Gloria's credibility, he was not in a position to question whether the evidence supported Weinke's guilt because, given the timing of the deposition and his lack of knowledge of the case (about which more below), he could not predict what that evidence would be. *People v. Rice*, 166 Ill. 2d 35, 41-42 (1995) (focus of cross-examination at suppression hearing too dissimilar from cross-examination at trial to be meaningful opportunity). Undoubtedly, Weinke's attorney would have cross-examined Gloria differently at trial than at the deposition. Though the right guarantees only an opportunity for effective cross-examination, not effective cross-examination itself, *People v. Klepper*, 234 Ill. 2d 337, 355 (2009), the inadequacy of the cross-examination was not due to any ineffectiveness on the part of Weinke's counsel, but rather by circumstances outside his control.

¶ 61   Another problem with defense counsel's cross-examination concerns his severe informational disadvantage. *Id*. ¶ 62 (lack of discovery procedures before preliminary hearing limited counsel's ability to cross-examine witness at hearing). The State argues that defense counsel had received all the documents in discovery that the State possessed, so defense counsel could not have been disadvantaged. Of course, the State did not disclose most of these documents until just two hours before the deposition (and some information, for example, as to

what medication Gloria received during the deposition, was never disclosed). It is specious to say that counsel received ample discovery if counsel lacked meaningful time to read, digest, and analyze it.

¶ 62     The time crunch was illustrated further by defense counsel's inability to view the crime scene. Because he had to wait for the State to give him discovery materials, he ran out of time to go to Gloria's home and see the balcony and staircase for himself. Given the amount of trial testimony about the precise appearance and measurements of Gloria's staircase (including expert witnesses opining about how she could or could not have hit the stairs on her way to the basement floor), this turned out to be vital information. Defense counsel was left to probe whether Gloria could have fallen down the stairs accidentally without knowing the layout. And of course, this informational disadvantage was created by the State—not only the dilatory manner of providing the discovery, but hurrying the deposition along when it was not medically necessary to do so.

¶ 63     Indeed, counsel's lack of time to prepare hampered his ability to probe into Gloria's memory and mental state. The State argues that Weinke could have provided counsel with all the information he needed, but the information about her memory problems was provided at trial by witnesses who had not yet been contacted. And whether Gloria's memory (or for that matter, her balance) could have been affected by her cancer medication is an issue counsel could not explore without further research into her medical history. *Torres*, 2012 IL 111302, ¶ 62-63 (defendant must show how additional cross-examination would have affected case to demonstrate that original opportunity inadequate).

¶ 64     The State argues that counsel could have conducted another deposition of Gloria during the remaining weeks before her death in October 2006. We do not find this persuasive, as there

is no evidence in the record that counsel had any idea that Gloria would not survive until trial. Gloria's surgeon testified at trial that he last saw Gloria two weeks before her death, and she was recovering from the surgery without complication.

¶ 65       We conclude that Weinke's counsel did not have an adequate opportunity to cross-examine Gloria at the deposition, and the deposition's admission at trial violated Weinke's constitutional right to confront witnesses against him.

¶ 66       Technically, the State's conduct does not affect our analysis of whether Weinke's constitutional rights were violated.  Even if the State had not repeatedly misguided the trial court, we would still hold that Weinke did not have a meaningful opportunity to cross-examine Gloria on a few hours' notice, given her medical condition.

¶ 67       When an assistant State's Attorney says that the prosecution has spoken to treating physicians, a trial court should be able to rely on that representation. In the absence of an affidavit or testimony regarding the "substantial possibility" that Gloria would be unavailable for trial, the assistant state's attorney had an added responsibility to be precise and accurate. Double or triple hearsay cannot be dressed-up as if it were first-hand fact. It should be noted that Crothers was not the only prosecutor involved in this case and undoubtedly gleaned some of her information from other state actors. But as Crothers spoke for the State in the proceeding, she is the attorney held responsible by this court.

¶ 68                                    Improper Questions in Cross-Examination

¶ 69       Weinke also argues that the trial court erred in allowing the State to repeatedly ask him, during cross-examination, whether other witnesses were lying in their testimony.  Weinke's counsel repeatedly objected to these questions, but the trial court overruled the objections.

¶ 70      It is improper for a prosecutor to ask a defendant to opine on the veracity of other witnesses; such a question intrudes on the jury's function to determine the credibility of those witnesses. See *People v. Schaffer*, 2014 IL App (1st) 113493, ¶ 49. The practice "demean[s] and ridicule[s]" the defendant, *id.*, and additionally places a defendant in an impossible "gotcha" situation.

¶ 71      The State correctly points out that, though Weinke's counsel objected contemporaneously to these questions, he failed to include this issue in his post-trial motion, as required to preserve it for appeal. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (both objection at trial and in written post-trial motion required to preserve issue for appellate review). Thus, the issue is reviewable only for plain error. *Id.* at 187. But Weinke failed to argue the plain error issue, either in his opening brief or (after the State discussed plain error in its appellee's brief) in his reply brief. Thus, Weinke has forfeited any argument that the prosecutor's cross-examination questions constituted plain error. *People v. Clark*, 2014 IL App (1st) 130222, ¶ 24. Accordingly, we will not review the claim. *People v. Hillier*, 237 Ill. 2d 539, 545-46 (2010).

¶ 72      In sum, based on trial error in regard to the granting of the emergency evidence deposition without proof, we reverse and remand for a new trial.

¶ 73      Reversed and remanded for a new trial.