ALBERTA RASMUSSEN, Plaintiff-Appellant, v. NANCY LaMAGDE-LAINE, Defendant-Appellee.

Second District   No. 2—90—0374

Opinion filed January 30, 1991.

Alex J. Victor, of Victor & LaFayette, of Rockford, for appellant.

No brief filed for appellee.

JUSTICE BOWMAN delivered the opinion of the court:

Plaintiff, Alberta Rasmussen, appeals from the judgment of the circuit court granting a directed finding in favor of defendant, Nancy LaMagdelaine. Plaintiff contends that the trial court erred in directing a finding in favor of defendant at the close of plaintiff's case because defendant had the burden to prove that certain joint accounts were *inter vivos* gifts from plaintiff to defendant.

We will summarize only those facts relevant to the issue on appeal. Plaintiff filed a complaint alleging that defendant, her daughter, converted approximately $20,000 from plaintiff's checking accounts which, plaintiff alleged, were convenience accounts. The undisputed facts are as follows. In 1987, plaintiff, then 85 years old, owned her home in Lake Zurich, Illinois. She had a joint savings account with defendant at the First National Bank of Barrington (Barrington account) in the amount of $10,000. On November 7, 1987, plaintiff sold her house for $63,422.82 (sale proceeds). Defendant deposited the sale proceeds in a joint checking account at First Federal Savings and Loan Association in Rockford (First Federal account). Plaintiff moved into defendant's home in Rockford.

On September 16, 1987, defendant closed the Barrington account and put the $10,000 into a certificate of deposit account in both plaintiff's and defendant's names. Plaintiff signed the signature card for the certificate of deposit account. On January 4, 1988, defendant cashed the certificate before its maturity date and received $9,978.98, which she kept for herself.

On November 9, 1987, plaintiff purchased a new automobile for defendant which was paid for by a check from the First Federal account. The check was signed by plaintiff. Plaintiff also signed the checks for the title and insurance for the automobile.

On November 11, 1987, defendant issued a check from the First Federal account payable to E.F. Hutton in the amount of $40,000. Of that amount, $30,000 was used to purchase securities in plaintiff's and defendant's names jointly, and the remaining $10,000 was used to purchase securities in defendant's name only. Defendant subsequently sold the securities from the latter account for cash.

At the bench trial, plaintiff called defendant as an adverse witness. Defendant testified that before plaintiff sold her house, defendant stayed with plaintiff on the weekends. Plaintiff occasionally stayed at defendant's house. Defendant cooked meals for plaintiff, but plaintiff paid for the groceries. Plaintiff helped defendant out with her

mortgage payments when defendant was going to school. Plaintiff also reimbursed defendant for expenses defendant incurred when helping plaintiff.

Defendant further testified that plaintiff moved into defendant's home after the sale of plaintiff's house and plaintiff agreed to pay defendant $400 per month for room and board. Defendant stated that plaintiff signed the check for the purchase of the automobile because defendant "would not sign that check." According to defendant, plaintiff told defendant the money for the certificate was defendant's, so plaintiff should not pay taxes for that account. Defendant stated that plaintiff told her to close the Barrington account and to move the money to Rockford, since plaintiff would not be living near Barrington. Defendant had student loans, which she paid off with the funds from the securities account.

Plaintiff testified that she had a checking and a savings account at the Barrington bank and that she did not authorize anyone to close the savings account. Plaintiff had approximately $10,000 in the account. She learned that the account had been closed when she went into the bank in January 1988 to withdraw some money from the account. Plaintiff was told that the account had been closed by defendant. At that time, plaintiff was unaware that defendant's name was on the account.

Plaintiff testified that she deposited the sale proceeds into an account at First Federal. Plaintiff's attorney asked her if the account was in the name of "Nancy LaMagdelaine and Alberta Rasmussen." Plaintiff responded:

"[Nancy's] name wasn't on it, I don't think.
　　***
That was my money."

Plaintiff's attorney again asked her if defendant was on the account, to which plaintiff answered:

"I don't remember. Was it or wasn't it? I don't think it would have been. It shouldn't have been."

A third time, plaintiff was asked by her own attorney if defendant was on the First Federal account. Plaintiff said she was not. Plaintiff's attorney then showed plaintiff a check from the First Federal account. The following colloquy then ensued:

"A. Her name is on it. This is First Federal? In Rockford?

Q. [Plaintiff's attorney]: Of Rockford. Is her name on that account?

A. Yes, it was. But it isn't on it now.

Q. No, no. We're talking about now; we're talking about

then. When you brought this money to Rockford, it was put in First Federal, is that correct?

A. Yes.

Q. And it was put into an account which reads Nancy La-Magdelaine and Alberta Rasmussen, is that right?

A. Yes.

Q. So that she had control of this money, is that correct?

A. She wasn't supposed to.

Q. Now, just answer my question.

A. Well, I guess she could have."

Plaintiff further testified that she and defendant talked about investing some of the money from the sale of the house. Plaintiff did not go with defendant to E.F. Hutton when defendant went to purchase the stock. After plaintiff asked her attorney to investigate the closing of the Barrington account, plaintiff learned that defendant had used $10,000 of the money that was allocated for the stock to purchase her own stock.

Plaintiff denied that she ever promised to pay for defendant's student loans. Plaintiff stated that she gave defendant the automobile as a gift because defendant was driving plaintiff's old automobile and it was not safe to drive. Plaintiff moved in with defendant in November 1987 and paid defendant $400 per month for room and board. Plaintiff signed two checks made out for that amount to defendant. Plaintiff also signed the checks for the purchase of the automobile and the insurance and title for it.

Plaintiff again testified that she did not authorize defendant to close the Barrington account, nor did she authorize defendant to take $10,000 from the proceeds of the sale of the house to put stock in defendant's own name. Plaintiff's only assets were the sale proceeds and the $10,000 in the Barrington account.

While plaintiff was living in Lake Zurich, defendant used to take plaintiff shopping. Plaintiff paid defendant's mortgage payments numerous times. Plaintiff testified that every time defendant asked for money, plaintiff gave it to her. Plaintiff had "given her as much as $500 at a time." Plaintiff had thought she could trust defendant and even put defendant's name on plaintiff's safety deposit box.

In the latter part of 1987, plaintiff "was blind" and had undergone cataract surgery. Subsequently, plaintiff had implants in both eyes, and, at the time of trial, her vision had improved. During the time that defendant allegedly converted plaintiff's money, plaintiff "couldn't see much," and several times during that period, defendant brought plaintiff papers for plaintiff to sign. When defendant told

plaintiff that something needed to be signed, plaintiff signed it because she "believed anything" defendant told her.

During cross-examination, plaintiff stated that she had been having trouble with her eyes for about three or four years. After she received the implants, her vision improved, but she needed a magnifying glass to be able to read. According to plaintiff, prior to her eye surgery, she would sign her checks, but most of the time someone else filled in the body of the check, and she would just sign it.

Plaintiff stated that defendant's name was not supposed to be on the checking account at the Barrington bank, "but it got on there somehow because she wrote a check on it." Plaintiff asked defendant how her name got on the account, and defendant told plaintiff she put her name on plaintiff's account so defendant's sister would not be able to take plaintiff's money.

Defendant's attorney further questioned plaintiff as follows:

"Q. [Ms. Greenlee]: Mrs. Rasmussen, in your complaint, you say that your daughter's name was on the checking account at the Barrington Bank. That's what you say in your complaint. Now you just told us that it wasn't supposed to be there, that she just did it on her own. Which is right?

A. Well, now, she wrote a check on it so it must have—oh, that's the account that her name got on it. I asked her how it got on there because I don't know why it was there when I saw it was on it one day."

Plaintiff denied that she ever had a joint account with defendant at the Barrington bank, even though defendant's attorney had bank records which showed that there was a joint account at that bank which was closed in March 1984. Defendant's attorney asked if plaintiff remembered it, and plaintiff stated that she did not remember that account, but admitted that she might have opened that account with defendant. Plaintiff also admitted that she had trouble with her memory.

When asked whether the First Federal account was opened with plaintiff's consent, plaintiff stated:

"I never gave her permission to open that account at First Federal. What year was that in?"

On further questioning, plaintiff reiterated that she used to trust defendant, so plaintiff might have had a joint account with defendant and forgot about it.

Plaintiff stated that she did not know that the E.F. Hutton account was a joint account with defendant. When shown the joint tenancy agreement, plaintiff acknowledged that her signature appeared

at the X, but when asked if the document was the joint tenancy agreement, plaintiff responded that she could not see it. Defendant's attorney asked plaintiff if she could have forgotten that she opened the account as a joint tenancy, to which plaintiff responded that she did not know. Plaintiff denied knowing how her signature got on the agreement.

Plaintiff also did not remember if she went with defendant to First Federal to open a joint checking account, but she acknowledged that she "could have done it" because plaintiff "used to trust" defendant.

During redirect examination, plaintiff explained that she did not read the joint tenancy agreement before she signed it because she was unable to see. Plaintiff stated, "[a]nything I couldn't see I trusted her to tell me it was all right or not" to sign and that anything defendant told her to do "was all right." Plaintiff thought that everything was fine until after she moved out of defendant's home, when she learned that the Barrington account had been closed. Plaintiff lost all trust in defendant.

After plaintiff's testimony, defendant made a motion for a directed finding. The court found that the signature cards for the joint accounts created a presumption of a donative intent. The court stated that plaintiff's testimony was "contradictory" and, therefore, plaintiff failed to establish a *prima facie* case. The court granted defendant's motion for a directed finding and entered judgment for defendant.

Plaintiff filed a motion to reconsider the judgment. Plaintiff argued the judgment was based on two erroneous findings: first, that the joint tenancy agreement created a presumption of a gift to defendant; and second, that plaintiff failed to prove by clear and convincing evidence that there was no donative intent. Following a hearing, the court denied the post-trial motion. Plaintiff's timely appeal followed.

■ Although defendant has not filed an appellate brief, we may resolve the issue presented on the merits without the aid of an appellee's brief in conformance with the standards set forth in *First Capitol Mortgage Corp. v. Talandis Construction Corp.* (1976), 63 Ill. 2d 128, 131-33.

■ Plaintiff contends that the court's decision to direct a finding in favor of defendant was erroneous. In a nonjury case, when ruling on a motion for a directed finding at the close of plaintiff's case in chief, the court is to take into account all the evidence, including any which supports defendant's position; make judgments regarding the credibility of the witnesses; draw inferences from the testimony; and

consider the weight and quality of the evidence. (Ill. Rev. Stat. 1987, ch. 110, par. 2—1110; *Kokinis v. Kotrich* (1980), 81 Ill. 2d 151, 154.) A reviewing court may reverse the determination made by the trial court only if it is contrary to the manifest weight of the evidence. *Kokinis*, 81 Ill. 2d at 154.

■■ When presented with a motion to direct a finding, the trial court must first determine, as a matter of law, whether the plaintiff has made out a *prima facie* case. (*Kokinis*, 81 Ill. 2d at 154-55.) A plaintiff has made out a *prima facie* case if she has presented at least some evidence on every element essential to the cause of action. (*Kokinis*, 81 Ill. 2d at 154.) If a *prima facie* case has been presented, the trial court must go further and, after weighing the plaintiff's evidence, decide if any of the evidence necessary to plaintiff's *prima facie* case has been negated. If it has, then the action must be dismissed. (*Kokinis*, 81 Ill. 2d at 155; *Illinois Education Association v. Illinois Federation of Teachers* (1982), 107 Ill. App. 3d 686, 688.) In our opinion the conclusions drawn by the trial court, after it took each of the steps set forth above, are not contrary to the manifest weight of the evidence and, therefore, the court did not err in granting defendant's motion for directed finding.

■ Plaintiff has brought an action for conversion of her funds. The elements which must be shown in an action for a conversion are: (1) unauthorized and wrongful assumption of control, dominion, or ownership by defendant over the personal property of another; (2) the plaintiff's right in the property; (3) the plaintiff's absolute and unconditional right to immediate possession of the property; and (4) a demand by plaintiff for possession of the property. (*Illinois Education Association*, 107 Ill. App. 3d at 689.) Review of the pleadings, testimony, and exhibits shows that at least some evidence was presented on each of these elements. Defendant admitted in her answer that she had received the money, in the amounts alleged, for her own use and that plaintiff had demanded the return of the money. Plaintiff's own testimony constituted evidence that she had provided all the money in the accounts, that she intended and thought that the money belonged only to her, and that she had never authorized her daughter to take money from the accounts without permission. In light of this evidence, the trial court could properly have concluded that plaintiff made out an initial *prima facie* case.

●■■ When the court proceeded to weigh the evidence and determine the credibility of the witnesses, it took into consideration the effect of a presumption which, as urged by defendant and found by the court, had arisen from evidence that plaintiff and defendant were

joint tenants in both of the relevant accounts. While plaintiff steadfastly insists that the trial court erred in applying a presumption, her position is not supported by the law on this issue. When a valid joint tenancy is shown, a presumption arises that the joint tenant who provided funds for the account did so with the intent of making a gift to the other joint tenant. (*Frey v. Wubbena* (1962), 26 Ill. 2d 62, 70-71; *Murgic v. Granite City Trust & Savings Bank* (1964), 31 Ill. 2d 587, 590.) The presumption can be overcome only by clear and convincing evidence that a gift was not intended, and the burden of proof is on the one who claims it was not a gift. (*Murgic*, 31 Ill. 2d at 591.) Whether a gift was intended must be determined as of the time the joint account was created, and it is irrelevant that the donor may have later changed his mind about having the donee as a joint tenant. (*In re Estate of Marx* (1973), 11 Ill. App. 3d 727, 728-29.) In this case it was essentially undisputed that Mrs. Rasmussen had established both accounts as joint tenancy accounts with her daughter as a joint tenant. While Mrs. Rasmussen testified that she did not remember creating the two accounts, she admitted that her signature was on various bank records pertinent to the creation of both of the accounts. The validity of the bank documents was not otherwise challenged. On these facts the trial court correctly recognized the presumption that Mrs. Rasmussen had created the accounts with the intent of making a gift to her daughter.

We think the trial court also correctly concluded that plaintiff was unable to rebut the presumption by clear and convincing evidence. As a whole, the record reveals little to show that plaintiff did not have donative intent at the time the joint accounts were established. Mrs. Rasmussen's testimony regarding her intent focused almost exclusively on events occurring after the accounts were in place. What testimony she did give regarding the accounts themselves conflicted with the allegations of her complaint. There were also significant inconsistencies and contradictions within the plaintiff's testimony itself. Mrs. Rasmussen admitted that she had "all sorts of trouble" remembering.

In contrast to the above, it appears clear from other evidence that Mrs. Rasmussen had been close to, and had great trust in, her daughter. In fact, Mrs. Rasmussen testified that she had never previously confronted Nancy about problems with the accounts because she had trusted her daughter. It seems evident that Mrs. Rasmussen's confidence in Nancy remained intact right up until the time this dispute arose between them. The controversy began *after* both of the accounts in controversy had been established. Finally, Nancy testified

that the money had been a gift to her from her mother and that she considered the money her own.

The trial court was required to consider plaintiff's intent at the time the joint accounts were established. In light of the meager evidence of Mrs. Rasmussen's intent at that time, the poor quality of her testimony, and the evidence that the money in the joint accounts was a gift, we can find no error in the lower court's conclusion that plaintiff did not rebut the presumption of donative intent by clear and convincing evidence. Accordingly, the court could correctly find that the money provided by Mrs. Rasmussen for the joint tenancy accounts constituted a gift to her daughter. It follows then that the money belonged to Nancy and she had a right to take and use it as she wished. Since defendant did not wrongfully assume control over the personal property of another, one element of conversion could never be shown. After all the evidence was weighed and evaluated, it negated some of the evidence necessary to plaintiff's *prima facie* case, and the court properly directed a finding in favor of defendant. *Kokinis v. Kotrich* (1980), 81 Ill. 2d 151, 155.

There is no merit in plaintiff's further claim that the trial court focused on donative intent to the exclusion of the other elements necessary for a valid *inter vivos* gift. The elements of a valid gift are donative intent, the donor's surrender of exclusive dominion and control over the subject of the gift, and delivery of the gift to the donee. (*Wencordic Enterprises, Inc. v. Berenson* (1987), 158 Ill. App. 3d 913, 919.) The *Frey* court established that a showing of voluntary creation of a joint tenancy in property is sufficient to demonstrate both the donor's surrender of exclusive dominion over the subject of the gift and delivery of the gift by the donor. (*Frey v. Wubbena* (1962), 26 Ill. 2d 62, 72.) Donative intent, as we have already concluded, was adequately shown here by the joint tenancy accounts. Thus, an *inter vivos* gift was sufficiently established.

For the reasons set forth above the judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

NICKELS and INGLIS, JJ., concur.