2026 IL App (1st) 240238

No. 1-24-0238

Opinion filed June 5, 2026

FIFTH DIVISION

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, |
| | ) | Criminal Division. |
| v. | ) | |
| | ) | No. 2019 CR 6028301 |
| CHRISTINA WRIGHT, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Pamela J. Stratigakis, |
| | ) | Judge, presiding. |

PRESIDING JUSTICE MITCHELL delivered the judgment of the court, with opinion.
Justice Mikva and Justice Wilson concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a bench trial, defendant Christina Wright appeals her conviction and sentence

for financial exploitation of an elderly person (720 ILCS 5/17-56(a) (West 2018)). At issue is (1)

whether the evidence was sufficient to convict defendant beyond a reasonable doubt because she

contends it did not establish that she obtained control of the victim's bank account through

deception or illegally used her assets; (2) whether the circuit court erred by admitting the victim's

prior testimony in violation of defendant's rights under the confrontation clause because defendant

had insufficient opportunity to cross-examine the victim; (3) whether defendant's counsel was

ineffective for failing to challenge the victim's competency based on cognitive decline where the

victim lacked recollection during testimony; (4) whether counsel was ineffective for not objecting to evidence pertaining to a bank's fraud investigation into relevant accounts because it contained hearsay; and (5) whether the circuit court erred in sentencing defendant because it relied on factors inherent to the offense. For the following reasons, we affirm.

¶ 2                                I. BACKGROUND

¶ 3      Grace Watanabe, the victim, first encountered defendant after moving into a senior living center in Lincoln Park in 2009, according to Watanabe's testimony at a preliminary hearing. Eager for "something to do," the 98-year-old Watanabe testified she partook in activities led by defendant as activities director at the facility.

¶ 4      Watanabe testified that she had accumulated a large sum of money in a Merill Lynch investment account and became concerned about what would happen to her assets if she passed unexpectedly. Watanabe created a list of eleven people she knew "were in need of some financial help" and gave them one check each. At the time of the preliminary hearing, she was uncertain whether defendant was on that list of check recipients but guessed that she was. Watanabe testified that she "never did any online banking," though she knew how, and had not authorized anyone to transfer funds or open a Bank of America account online on her behalf.

¶ 5      Nevertheless, the parties stipulated that, between the end of March and early August 2017, five checks totaling over $110,000 were drawn on Watanabe's accounts and deposited into defendant's accounts. The last check was the largest: $50,000, with a memo line reading "gift." The stipulation stated that less than two weeks later, a new Bank of America account was opened online in defendant and Watanabe's names, funded by two of Watanabe's other bank accounts. Several online transfers followed. Specifically, from August through October 2017, someone transferred over $40,000 from the joint account to defendant's sole account.

¶ 6    Bank of America then began investigating Watanabe's accounts and ultimately froze defendant's individual accounts that received funds from the joint account, according to bank records and a bank employee's testimony. Thereafter, bank records show that Bank of America received a series of calls from defendant. She sent them two letters, both admitted at trial, that purported to authorize her to act on Watanabe's behalf with respect to the joint account. Both were signed by defendant and Watanabe, and one appeared to be notarized by a Chicago attorney. Bank records established Bank of America closed one of defendant's individual bank accounts and made a series of temporary credit adjustments restoring funds to Watanabe's accounts. Another of defendant's individual bank accounts was also closed, according to the stipulation. In total, bank statements from defendant's and Watanabe's accounts referenced at trial showed that defendant received over $150,000 from Watanabe over the course of approximately one year; over $40,000 was through online transfer.

¶ 7    In December 2019, the State charged defendant with one count of financial exploitation of an elderly person (720 ILCS 5/17-56(a) (West 2018)), one count of unauthorized theft (*id.* § 16-1(a)(1)(A)), two counts of financial institution fraud (*id.* § 17-10.6(c)(1)-(2)), and one count of wire fraud (*id.* § 17-24(b)(1)-(2)(A)). Before trial, Watanabe passed away and the State successfully moved *in limine* to admit her testimony from the preliminary hearing over defendant's objection. Ill. R. Evid. 804(b)(1) (eff. Jan. 1, 2011). The parties stipulated to various accounts, transfers, and checks, and the State offered bank statements for Watanabe's accounts, defendant's accounts, and the joint account, as well as Bank of America's investigatory records related to the joint account. A Bank of America senior investigator testified, primarily reading from the bank statements and explaining terms they contained, as did the attorney whose notary stamp appeared on one of the letters defendant sent to the bank.

¶ 8 The circuit court ultimately acquitted defendant of wire fraud but found her guilty on all other counts before merging them into the financial exploitation of the elderly count and sentencing defendant to four years' probation. This timely appeal followed. Ill. S. Ct. R. 606 (eff. Dec. 7, 2023).

¶ 9                                          II. ANALYSIS

¶ 10                              A. Sufficiency of the Evidence

¶ 11 Defendant argues the State did not prove her guilty beyond a reasonable doubt because it did not establish that she obtained control of the victim's accounts through deception or illegally used her assets. Defendant contends it was equally likely that Watanabe performed or authorized the relevant online transfers and that she created or authorized defendant to create the joint account to gift money to defendant. The State contends the evidence was sufficient where Watanabe denied authorizing any transfers or joint accounts and did not bank online, and the attorney whose notary stamp and signature appeared on the letter purportedly authorizing defendant to act on Watanabe's behalf disavowed it during his testimony.

¶ 12 When reviewing the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original and internal quotation marks omitted.) *People v. Bush*, 2023 IL 128747, ¶ 33; *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). A reviewing court does not retry the defendant on appeal or substitute its judgment for that of the trier of fact as to the weight of the evidence or witness credibility. *People v. Conway*, 2023 IL 127670, ¶ 16. "A criminal conviction will not be overturned unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Id.*

¶ 13    Under Illinois law, a person commits financial exploitation of the elderly "when he or she stands in a position of trust or confidence" with a person over 60 years of age and "knowingly and by deception or intimidation obtains control over the property of *** or illegally uses the assets" of that person. 720 ILCS 5/17-56(a), (c)(1). Illegal use "includes, but is not limited to, the misappropriation of those assets *** by undue influence, breach of a fiduciary relationship, fraud, deception, extortion, or use of the assets or resources contrary to law." *Id.* § 17-56(c).

¶ 14    Defendant concedes she stood in a position of trust and confidence as to Watanabe and that Watanabe qualified as elderly under the statute. But she contends that the State failed to prove that defendant "illegally used" Watanabe's assets. The factual basis for criminal liability was creating the joint account, transferring funds from that account without authorization, and submitting letters to Bank of America. But each side uses various legal terms, without citation to the Criminal Code, to describe that conduct: fraudulent transactions, obtaining unauthorized control of assets, illegally obtaining and using assets, and misappropriation of assets through fraud and deception. We interpret the briefs and the record below as articulating a theory of illegal use based on the counts that merged with the financial exploitation count upon conviction: theft (*id.* § 16-1(a)(1)(A) (West 2018)) and financial institution fraud (*id.* § 17-10.6(c)(1)-(2)).

¶ 15    "A person commits theft when he or she knowingly *** [o]btains or exerts unauthorized control over property of the owner" with the intent to permanently deprive the owner of such property. *Id.* § 16-1(a)(1)(A); *People v. Bailey*, 409 Ill. App. 3d 574, 590 (2011) (affirming conviction for financial exploitation of the elderly charged alongside theft, noting that authorization was an element of both and that the victim "did not authorize [the defendant] to deplete her life savings"). "A person commits financial institution fraud when he or she knowingly executes or attempts to execute a scheme or artifice" to "defraud a financial institution" or "to

obtain any of the moneys *** under the custody or control of a financial institution, by means of pretenses, representations, or promises he or she knows to be false." *Id.* § 17-10.6(c)(1)-(2).

¶ 16    At the preliminary hearing, Watanabe testified she "never did any online banking" or gave anyone permission to transfer money out of her accounts. Further, she only gave monetary gifts by check. The bank statements corroborated that testimony. Watanabe's statements showed no online transactions in the month preceding creation of the joint account. Then, once the online transfers began, a correlation arose between who received the transfer and the transfer method. Of the transfers addressed at trial, those moving Watanabe's funds into the joint account and from the joint account to defendant's individual accounts were performed online; transfers restoring funds to Watanabe's individual accounts and moving funds among those accounts were through check or agent-assisted transfer, which Bank of America investigator Daniel Krukowski testified took place over the phone or in person.

¶ 17    The State also offered two letters defendant submitted to Bank of America after her accounts were frozen. One letter was dated June 16, 2017, and the other was undated. The June 16 letter authorized defendant to open Bank of America accounts online and to give cash gifts on Watanabe's behalf while noting that the "arrangement" was strictly confidential:

> "This letter is confirmation that I, Grace Watanabe will be giving permission to Christina Wright to open my Bank of America Accounts online. I also asked her to give out cash gifts on my behalf. I will be closing another personal account and the funds will be placed in my Bank of America Checking Account. Once those funds clear, I will open a joint savings account with both, my name and Christina's name. These arrangement [*sic*] need to be kept between us. Before any funds clear, I will be asking Christina Wright to make a donation to Mercy Home for Boys and Girls on my behalf."

Defendant and Watanabe's signatures appear at the bottom of the letter, followed by a hand-drawn signature line bearing a Chicago attorney's signature and notary stamp; his firm's logo and address block are in the bottom right-hand corner. Watanabe testified that she did not recognize the June

16 letter and did not think she ever signed it. She denied delegating gift-giving as the letter described or permitting defendant to open Bank of America accounts online on her behalf.

¶ 18　The attorney whose name appeared on the June 16 letter testified at trial and corroborated Watanabe's testimony—he did not prepare, sign, or notarize the document. He reviewed the letter on the stand and identified several issues: though he was a notary public, he notarized documents "strictly for [his firm's] clients," and "99.9% of the time" those documents were attorney's liens or settlement releases. After reviewing his firm's client database, which contained a record of "every single case" and client with whom the firm worked, the attorney confirmed neither defendant nor Watanabe were clients. He also testified that the address and logo at the bottom of the letter did not accord with his firm's practice of sending out all correspondence on letterhead. The attorney identified them as coming from his business card and balked at the idea that he would ever "plaster his business card" or, as the letter's author did, write by hand on a business letter. He identified the signature as his and remarked that it was "obviously pulled from something else."

¶ 19　Finally, the attorney could not identify defendant in court and did not recognize Watanabe when he reviewed her photograph. Indeed, when Watanabe viewed a photo of the attorney, who supposedly witnessed her signature, she testified similarly: "That is a stranger. I have never—He could be off of television for all I know."

¶ 20　The undated letter was not notarized but did contain defendant's signature and, on its face, Watanabe's. Like the June 16 letter, it stated defendant could give out cash gifts and open Bank of America accounts online on Watanabe's behalf. Watanabe testified that she had never seen the document before, would not write a business document or even a personal card without dating it, and that the signature looked partially like hers but there were discrepancies in some of the letters.

¶ 21　Based on Watanabe and the attorney's testimony, a reasonable trier of fact could infer that

the letters were not genuine and had been manufactured by defendant to fraudulently authorize the joint account. 720 ILCS 5/17-10.6(c)(2) (defining financial institution fraud as an attempt to execute a scheme to obtain money under a financial institution's custody). The submission of letters to Bank of America purporting to authorize defendant to open the joint account, together with the bank statements and Watanabe's testimony regarding her banking practices, supported a reasonable inference that defendant, not Watanabe, created the joint account and effected the online transfers without authorization. *Id.* § 16-1(a)(1)(A) (defining theft as obtaining or exerting unauthorized control over property with the intent to permanently deprive the owner of the same). Thus, a reasonable fact finder could conclude that defendant's actions constituted illegal use of Watanabe's assets beyond a reasonable doubt.

¶ 22    Defendant raises several additional arguments challenging her conviction. First, defendant argues the State offered no evidence that she misled or concealed material facts from Watanabe regarding the notarized letter. This argument rests on the exploitation statute's definition of deception as "a misrepresentation or concealment of material fact relating to the terms of a contract or agreement entered into with the elderly person." *Id.* § 17-56(c)(4). Here, liability did not stem from defendant misleading or concealing material facts from Watanabe to induce her to sign the authorization letter. The State's theory was that defendant bypassed Watanabe altogether by creating the joint account and transferring funds to herself. Evidence that defendant deceived Watanabe was not necessary.

¶ 23    Second, defendant contends that the State's claim that the letters were fraudulent just because Watanabe did not remember signing them was unreasonable speculation. See *Bailey*, 409 Ill. App. 3d at 575-76 (affirming a conviction for financial exploitation where defendant transacted purportedly on behalf of an elderly woman suffering from dementia). The State did not argue at

trial that the letters were fraudulent because Watanabe could not remember signing them. It argued, and Watanabe testified, that she did not sign the letters at all, and the attorney whose notary stamp appeared on the letter corroborated Watanabe's account.

¶ 24 Defendant also contends the State did not prove illegal use because Watanabe and defendant had a valid joint tenancy over the joint account giving rise to a presumption that Watanabe funded the joint account with the intent to give money to defendant. See *Rasmussen v. LaMagdelaine*, 208 Ill. App. 3d 95, 103-104 (1991) (affirming a directed finding for defendant in a civil conversion case). That presumption can be overcome by clear and convincing evidence that a gift was not intended. *Id.* at 103. As discussed, a reasonable fact finder could determine Watanabe did not authorize the creation of the joint account beyond a reasonable doubt. Thus, any presumption of donative intent, assuming one arose, was indeed overcome. *People v. Hernandez*, 2017 IL App (1st) 150575, ¶ 94 ("Clear and convincing evidence means evidence greater than a preponderance of the evidence but less than proof beyond a reasonable doubt.").

¶ 25 Next, defendant contends that the State could not prove defendant opened the joint account because whoever did so used Watanabe's social security number, which is not something one would typically share with even the closest caretakers. See *People v. Sanchez*, 2013 IL App (2d) 120445, ¶¶ 17-39 (reversing a conviction for identity theft where the relevant statute required the State to prove the defendant "knowingly use[d] any personal identifying information *** of another person"(internal quotation marks omitted)). In this case, knowledge of Watanabe's social security number was not, as in *Sanchez*, an element of the offense charged but was instead part of a larger chain of facts leading to the conclusion that defendant took Watanabe's funds. The trier of fact need not find "each fact in the chain of circumstances beyond a reasonable doubt. Rather, the trier of fact must find only that the evidence taken together supports a finding of the defendant's

guilt beyond a reasonable doubt." *People v. Jackson*, 2020 IL 124112, ¶ 70. Considering the evidence establishing defendant created the account without Watanabe's participation, a failure of proof on the discrete fact that she knew Watanabe's social security number does not render the evidence at trial so unsatisfactory as to create a reasonable doubt regarding defendant's guilt.

¶ 26    Next, defendant argues that the circuit court could equally have inferred that Watanabe forgot that she made the online transfers herself or authorized defendant to do so, citing *People v. Steading*, 308 Ill. App. 3d 934, 940 (1999) ("A fact cannot be inferred when a contrary fact could be inferred with equal certainty from the same evidence."). Defendant relies on Watanabe's testimony that she wanted to give money away, lapses in memory Watanabe exhibited at the preliminary hearing, and a guardian *ad litem* report obtained from the docket in Watanabe's guardianship proceeding indicating she suffered from dementia. Defendant also notes that entries in investigatory records from Bank of America stated Watanabe sought to withdraw a fraud claim as to the joint account.

¶ 27    Watanabe's general testimony that she wanted to give some amount of money away to several individuals via check does not allow for an equally reasonable inference that she intended to give defendant over $40,000 via online transfer. With respect to the guardian *ad litem* report, it cannot be evidence supporting a reasonable inference as to Watanabe's memory because it was never evidence at all. The report is not part of the record on appeal and was not before the circuit court. As to the entries from the Bank of America investigatory records defendant references, they indicated that a confused Watanabe appeared at a Bank of America branch to withdraw a fraud claim regarding the joint account. That provides faint support for an inference that she authorized the transfers. If the circuit court credited the entry as defendant proposes, it also established that Watanabe previously claimed the account was fraudulent.

¶ 28 Finally, defendant argues Bank of America employee Daniel Krukowski's testimony exceeded the bounds of lay testimony. Defendant argues this point under sufficiency of the evidence rather than as a separate admissibility issue. She does not contend the circuit court abused its discretion in admitting the testimony but instead that because Krukowski was an unqualified expert, his testimony did little to prove the State's case. The circuit court observed Krukowski's live testimony, and this court cannot do what defendant requests in a sufficiency analysis: evaluate the credibility of a witness and reweigh the value of his testimony. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009).

¶ 29                    B. Admission of Preliminary Hearing Testimony

¶ 30 Defendant argues the circuit court erred in admitting Watanabe's preliminary hearing testimony at trial in violation of defendant's rights under the confrontation clause. U.S. Const., amend. VI. Defendant contends limits on cross-examination and the lower evidentiary burden on the State at preliminary hearings prevented her from fully developing testimony to support her defense. The State argues no violation occurred where defendant had discovery prior to the preliminary hearing and an opportunity to cross-examine Watanabe without limitation.

¶ 31 The parties dispute the standard of review. When analyzing a confrontation clause issue, admissibility, typically within the circuit court's discretion, turns on a question of law that this court reviews *de novo*. See *People v. Torres*, 2012 IL 111302, ¶¶ 46-47 (explaining that regarding the confrontation clause, "constitutional considerations are inextricably intertwined with the question of admissibility," but defendant's rights were violated under either standard). Illinois courts have applied both standards. Compare, *e.g.*, *People v. Pacheco*, 2023 IL 127535, ¶ 48 ("Whether cross-examination has satisfied constitutional scrutiny is a question of law we review *de novo*."), and *People v. Blue*, 205 Ill. 2d 1, 13 (2001) (explaining that the circuit court's discretion

to limit cross-examination "arises only after the court has permitted sufficient cross-examination to satisfy the confrontation clause"), with *People v. Sutherland*, 223 Ill. 2d 187, 272-73 (2006) (reviewing for abuse of discretion). Where we are as well-situated as the circuit court to decide the question, and the Illinois Supreme Court has resolved confrontation clause issues pertaining to restrictions on cross-examination under a *de novo* standard, *de novo* review applies. Under either standard, the outcome would be the same.

¶ 32    "In all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him[.]" U.S. Const., amend. VI. Thus, "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford v. Washington*, 541 U.S. 36, 59 (2004). The Illinois Rules of Evidence except an unavailable witness's prior testimony from the rule against hearsay only if the party opposing admission had "an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Ill. R. Evid. 804(b)(1) (eff. Jan. 1, 2011). The issue is whether defendant had sufficient opportunity to cross-examine Watanabe.

¶ 33    "Merely providing some opportunity to cross-examine at a preliminary hearing does not necessarily establish that the party had an *adequate* opportunity." (Emphasis added.) *People v. Rice*, 166 Ill. 2d 35, 40 (1995). To be adequate, the cross-examination at the prior hearing must have had the same or similar "motive and focus" as the subsequent proceeding. *Sutherland*, 223 Ill. 2d at 273. The defendant must have been free to "fully question the witness regarding critical areas of observation and recall, to test him for any bias and prejudice, and to otherwise probe for matters affecting his credibility ***." *Torres*, 2012 IL 111302, ¶¶ 62, 64 (considering "the restrictions—overt and covert—on defense counsel's cross-examination" as part of the adequacy

of opportunity to cross-examine). Since preliminary hearings may precede discovery, the defendant must also have had sufficient information at the time of the hearing to probe credibility. *Id.* ¶¶ 62-63 (explaining that "what counsel *knows* while conducting the cross-examination may, in a given case, impact counsel's ability and opportunity to effectively cross-examine the witness at the prior hearing" before noting that the missing information at issue prevented counsel from inquiring about bias or prior inconsistent statements (emphasis in original)).

¶ 34   When Watanabe testified at the preliminary hearing, defendant faced the same charge of which she was later convicted at trial, financial exploitation of an elderly person. Though the preliminary hearing assessed probable cause as opposed to guilt beyond a reasonable doubt, it had the same purpose as the eventual trial: to determine "whether the evidence supports a finding that the defendant committed the charged crime." (Internal quotation marks omitted.) *People v. Lard*, 2013 IL App (1st) 110836, ¶ 18 (quoting *Torres*, 2012 IL 111302, ¶ 59). Defendant's motive was the same: to, where possible, undermine whatever testimony the State offered. *Id.* And counsel did. Where Watanabe testified on direct that she did not sign the authorization letters, counsel sought on cross-examination to elicit testimony from Watanabe that the signatures resembled her own. He questioned Watanabe extensively about her intent to gift money to defendant and then raised the defense at trial that Watanabe gave the funds to defendant as a gift.

¶ 35   Moreover, at the preliminary hearing, counsel conducted a cross-examination and re-cross examination without any objection from the State. The circuit court's sole interjection was to ask counsel to move slightly to give the court reporter a sight line to the witness. The record does not suggest any limitation placed upon defendant's ability to question Watanabe. Contrast *People v. Boston*, 2018 IL App (1st) 140369, ¶ 60 (affirming admission of preliminary hearing testimony where there was "no indication in the record that the court placed any time constraints or other

limitations on counsel's ability to cross-examine" and the circuit court sustained only one objection), with *Torres*, 2012 IL 111302, ¶ 64 (affirming barring of testimony where the circuit court's comments indicated it "was not enthusiastic" about proceeding with the hearing and sustained two objections, explaining "it [was] clear from the record that counsel would have done more with the witness at the preliminary hearing if he had felt free to do so").

¶ 36 Additionally, defense counsel acknowledged on the record that the State tendered discovery prior to the hearing. The State's motion to admit Watanabe's testimony at trial asserted that before the preliminary hearing, "complete discovery was tendered to [defendant's counsel]." Defendant's counsel confirmed as much at the hearing on the motion: "the statements in the State's motion are true. I was the attorney who cross-examined. State did tender me discovery." Where the cross-examination at the preliminary hearing shared the same motive and focus as trial, no limitation was placed on defendant's ability to cross-examine Watanabe, and defendant had access to the necessary information to do so fully, admission of Watanabe's preliminary hearing testimony did not violate defendant's rights under the confrontation clause.

¶ 37 Defendant contends that, like the defendant in *People v. Diggs*, she lacked critical information at the time of the preliminary hearing where counsel likely did not have the guardian *ad litem* report when he questioned Watanabe. IL App (1st) 220955, ¶ 135. On this point, *Diggs* is readily distinguished. In *Diggs*, the State moved *in limine* to use a deceased witness's testimony from the defendant's first trial against the defendant at a new trial. *Id.* ¶¶ 1-2. Between the time of trial and retrial, two men confessed to the murder Diggs was convicted of committing. *Id.* ¶ 48. The appellate court affirmed the circuit court's decision not to admit the prior testimony, citing the fact that courts had sometimes assessed "whether the new knowledge would have had an effect on the ultimate outcome of the prior proceeding" in determining adequacy of the opportunity for

cross-examination. *Id.* ¶¶ 137, 162. Here, the point of comparison is the guardian *ad litem* report, which defendant argues would have allowed counsel to inquire on cross-examination about whether Watanabe had ever forgotten signing something. But the report had been filed a year before the preliminary hearing, and a guardian *ad litem* accompanied Watanabe and identified herself at the hearing prior to questioning. Watanabe testified that she was 98 years old; counsel was aware of her age. Further, as defendant argues, Watanabe exhibited forgetfulness when she testified. Counsel could have asked about cognitive issues at the preliminary hearing regardless of the report, and therefore its absence did not affect the adequacy of defendant's opportunity to cross-examine Watanabe.

¶ 38 Defendant argues that because preliminary hearings are focused on probable cause as opposed to proof beyond a reasonable doubt, this cross-examination had a different focus from what would occur at trial. See *People v. Horton*, 65 Ill. 2d 413, 416-17 (1976). But the same is true of every preliminary hearing. Were that sufficient to bar testimony, preliminary hearing testimony would be *per se* inadmissible—a proposition the Illinois Supreme Court has repeatedly rejected. See *People v. Tennant*, 65 Ill. 2d 401, 410-11 (1976) (discounting defendant's argument that "the differences between the purposes of a preliminary hearing and those of a trial *** preclude admitting testimony given at a preliminary hearing" and affirming admission of preliminary hearing testimony); see *Rice*, 166 Ill. 2d at 39 ("As this court has stated, determining whether ample opportunity to cross-examine at the prior hearing exists does not lend itself to a *per se* determination, but must be decided on the circumstances of each case.").

¶ 39 Defendant also argues that, in this case, the State's direct examination limited the scope of defendant's cross-examination, preventing defendant from asking about several important topics: the State did not inquire about "any misleading or deceiving conduct" by defendant, about the

specific checks that Watanabe signed, or about particular transactions in the bank statements. Further, no direct examination occurred on the fraud claim Watanabe allegedly made and then attempted to withdraw. The impact of these deprivations, according to defendant, was that she was unable to develop testimony to support her defense: that Watanabe authorized her to take actions on her behalf and gave her monetary gifts.

¶ 40    The principle that cross-examination cannot exceed the scope of direct is not as restrictive as defendant suggests. "Although the scope of cross-examination is generally limited to the subject matter of direct examination and to matters affecting the witness' credibility, this limitation is construed liberally to permit inquiry into subjects tending to explain, discredit, or destroy the witness' direct testimony." (Internal quotation marks omitted.) See *People v. Butler*, 2025 IL 130988, ¶ 71. This is true "even if such examination constitutes new matter that aids the cross-examiner's case." *People v. Stevens*, 2014 IL 116300, ¶ 16. Further, "any permissible matter which affects the witness's credibility may be developed on cross-examination." (Internal quotation marks omitted.) *Id.*

¶ 41    On direct examination, the State inquired into Watanabe's use of computers and online banking and whether she authorized transfers out of her accounts. In response, Watanabe testified that she did not bank online and did not authorize transfers. Defendant was free, on cross-examination, to ask Watanabe more specific questions on those topics to further explain or discredit her testimony. That would encompass questions about specific transactions in the bank statements and about the withdrawal of her fraud claim. She was asked about her relationship with defendant, which would have permitted counsel to inquire about any deceptive conduct on defendant's part. As to the checks, counsel did inquire about them on cross-exam and secured favorable testimony that Watanabe gave defendant at least one monetary gift by check.

- 16 -

¶ 42 "[T]he Confrontation Clause imposes a burden on the prosecution to present its witnesses, not on the defendant to bring those adverse witnesses into court." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009). But once the State fulfills that obligation, the defendant must decide whether and to what extent he or she cross-examines those witnesses. *Cf. People v. Graves*, 2021 IL App (5th) 200104, ¶ 45 (rejecting argument that a child sex abuse victim's failure to testify about charged conduct on direct examination deprived the defendant of the opportunity to cross-examine about out-of-court statements, explaining that "a defendant's right to confront witnesses cannot be recast as the State's burden to confront witnesses" (internal quotation marks omitted)). Vindication of defendant's right to confront turns on the adequacy of defendant's opportunity to cross-examine, not whether counsel took full advantage of that opportunity from defendant's point of view. *Pacheco*, 2023 IL 127535, ¶ 47 ("[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Emphasis in original and internal quotation marks omitted.) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985))). Defendant's cross-examination was not limited by the circuit court, the State, or the amount of information at her disposal, and the opportunity for cross-exam was therefore adequate if, according to defendant, underutilized.

¶ 43 C. Ineffective Assistance of Counsel

¶ 44 1. *Failure to Impeach or Bar Watanabe's Testimony*

¶ 45 Defendant argues that she received ineffective assistance of counsel where trial counsel did not seek to have Watanabe declared incompetent to testify despite Watanabe exhibiting lapses in memory during her testimony and being accompanied by a guardian *ad litem.* Alternatively, defendant contends that counsel should have impeached Watanabe's testimony using details from

the guardian *ad litem* report. The State contends that counsel was not ineffective where an attack on competency would have failed and that avoiding the issue was sound trial strategy.

¶ 46    We review ineffective assistance of counsel claims *de novo. People v. Bates*, 2018 IL App (4th) 160255, ¶ 46. The United States and Illinois constitutions guarantee effective assistance of counsel for criminal defendants. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; see, *e.g.*, *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984); *People v. Moore*, 2020 IL 124538, ¶ 28. To establish ineffective assistance, "a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Domagala*, 2013 IL 113688, ¶ 36 (quoting *Strickland*, 466 U.S. at 694). "A defendant must overcome the strong presumption that counsel's challenged action or inaction was the product of sound trial strategy," *People v. Webb*, 2023 IL 128957, ¶ 22, and counsel is not ineffective for failing to make a meritless motion. *People v. Rogers*, 2021 IL 126163, ¶ 32.

¶ 47    "[I]n Illinois, *all* witnesses are presumed competent to testify." (Emphasis in original.) *People v. Nowicki*, 385 Ill. App. 3d 53, 86 (2008); 725 ILCS 5/115-14 (West 2018) (stating that all persons, regardless of age, are qualified to be a witness unless they are incapable of expressing themselves as to the matter at hand or of understanding their duty to testify truthfully). "A witness is competent to testify if he has the capacity to observe, recollect, and communicate, and his mental deficiency is considered only insofar as it affects credibility." *E.g.*, *People v. Williams*, 147 Ill. 2d 173, 212 (1991). The challenger bears the burden to show incompetence. *People v. Hoke*, 213 Ill. App. 3d 263, 272 (1991).

¶ 48    "The question raised by a competency issue is whether the witness is so bereft of his powers of observation, recollection, or narration that he is thoroughly untrustworthy as a witness on the

subject at hand." *People v. Davis*, 43 Ill. App. 3d 603, 614 (1976); *Hoke*, 213 Ill. App. 3d at 272 ("[T]he legislature deemed every person qualified to be a witness unless he or she is *incapable* of either expressing himself or herself so as to be understood [citation] or of understanding the duty of a witness to tell the truth [citation]." (Emphasis in original.)); see *People v. Greathouse*, 2014 IL App (5th) 120188-U, ¶ 24 ("The reality is that there is an extremely broad standard of competency which permits even very young children to testify.").

¶ 49    There were moments in her testimony where Watanabe's memory failed her. For example, she could not recall all eleven names that appeared on the list of people to whom she wanted to give money, explaining she would "kind of lose track of just when [she] did certain things, especially when it was something that [she] did 10 or, you know, more than 10 years ago." She said there were times she had a joint bank account with another person, when asked with whom, she said she was unsure if it was even a formal joint account: "there's so few times that I had joint kind of banking activity with anybody, so it's hard for me to say whether I had a joint, you know, formally a joint account with anyone."

¶ 50    But she also exhibited good recall and gave clear responses throughout. When the State asked a series of questions about authorizing others to use her bank accounts, her answers were firm:

> "Q. Did you ever give anyone permission to transfer money out of any of those accounts into their own accounts?
> A. Oh, no. Never had any occasion to do that.
> Q. Did you ever give anyone permission to take money out of your accounts?
> A. No. I always ran my own account.
> Q. And when you wanted to give money to someone, would you do it in the form of a check or cash?
> A. No, I don't think I gave cash much. I don't remember ever handing out cash. No, it was always a check—
> Q. But you would give checks?
> A. –yeah."

She gave defendant's job title, the names of defendant's co-defendant's children whom she got to know while at the facility, and the year she began living there, though it had been approximately a decade since she had moved in. Taking the testimony as a whole, any gaps in recollection were minimal compared to the cogent responses she gave throughout the remainder of the hearing, and she therefore exhibited sufficient ability to recollect to testify. *Williams*, 147 Ill. 2d at 213 (reviewing witness's testimony as a whole to determine whether she was competent to testify and concluding that her "memory lapses *** reflect more upon her credibility than her capacities"); *People v. Scott*, 108 Ill. App. 3d 607, 610 (1982) (rejecting the defendant's argument that a witness was incompetent due to senility, despite his testimony being "at times unresponsive and confusing," where he had the ability to "observe, recollect, and communicate"). Any motion to hold Watanabe to be incompetent based on her statements at the preliminary hearing was unlikely to succeed, and counsel was not ineffective for failing to bring one. See *Rogers*, 2021 IL 126163, ¶ 32.

¶ 51 Moreover, attacking competency overall or on cross-examination would have undermined the defense defendant raised at trial: that Watanabe willingly gave these funds to defendant. See, *e.g.*, *People v. Evans*, 186 Ill. 2d 83, 96-97 (1999) (holding defense counsel was not ineffective for failing to elicit testimony regarding defendant's extreme emotional disturbance to justify murder where defendant claimed innocence). Here, counsel's chosen strategy required him to argue in closing that Watanabe was of sound mind:

> "I think a couple things are clear. One, that Ms. Watanabe did want to give gifts, that's clear. It's not that she never wanted to give a dime of her money away or never wanted to do anything with it. It's also clear from this that Ms. Watanabe is able, legally, to understand proceedings. She was present in the courtroom, she answered questions from a prosecutor, she was cross-examined and answered those questions, so it's clear that at a base level, there was a competency to do those things."

***

> And there's nothing presented at all that at the time of these incidents she was incompetent and couldn't do anything. That's – It's not presented."

Was that strategy so unsound as to render counsel ineffective? The answer is plainly "No." Challenging competency would have posed a significant risk to defendant. Courts have affirmed convictions for financial exploitation of an elderly person where a defendant transacted to their benefit with a victim who was mentally impaired, either by dementia or other neurological illness. See *People v. Owsley*, 2013 IL App (1st) 111975, ¶ 27 (affirming a financial exploitation of the elderly conviction where the defendant knew the victim "was not capable of handling his finances" during the relevant time but convinced the victim to convey an interest in property to him anyway); *People v. Bailey*, 409 Ill. App. 3d 574, 590 (2011) (affirming conviction where "[the victim's] dementia precluded her from authorizing defendant's use of [the victim's] funds").

¶ 52    Seeking a competency hearing or further cross-examining Watanabe about her recollection may have helped establish cognitive impairment at the time of the preliminary hearing. It also could have adduced evidence that the impairment extended to the period where defendant claimed Watanabe gave money to defendant and authorized her to open the Bank of America account. See *People v. Perry*, 224 Ill. 2d 312, 344-45 (2007) (counsel not ineffective for failing to object where doing so might have drawn out additional testimony damaging to defendant). "A reasoned decision to make the best of a bad situation by pursuing a particular line of defense satisfies the constitutional minimum," and considering the various theories of liability contemplated by the financial exploitation statute, counsel was not ineffective for not pursuing competency. (Internal quotation marks omitted.) *Evans*, 186 Ill. 2d at 97.

¶ 53                              2. *Failure to Object to Hearsay*

¶ 54 Defendant argues counsel was further ineffective for not arguing that the bank records, specifically Bank of America investigatory reports, were inadmissible hearsay because they lacked an authentication affidavit under Illinois Rule of Evidence 902 (eff. Sept. 28, 2018). She also contends the reports themselves contained hearsay. The State contends that even absent an authentication affidavit, Krukowski testified as the custodian of the records such that any objection would have been meritless. When challenging counsel's failure to object to evidence, the "defendant must establish that the challenged evidence was, in fact, inadmissible." *People v. Torres*, 2024 IL 129289, ¶ 28. Decisions regarding "what matters to object to and when to object" are generally matters of trial strategy. (Internal quotation marks omitted.) *Perry*, 224 Ill. 2d at 344.

¶ 55 The State offered, in relevant part, two documents labeled "case reviews." One refers to Watanabe's individual account at Bank of America, and the other refers to the joint account. Each consists of a cover sheet with account, customer, and claim information followed by a log of investigation-related activity presented as a table of time-stamped entries bearing the names of various Bank of America employees. The sole issue defendant raises with the threshold admission of these case reviews is that they were not accompanied by an authenticating affidavit and Krukowski did not have sufficient personal knowledge or expertise. Ill. R. Evid. 902(11).

¶ 56 Under the Illinois Rules of Evidence, a hearsay exception exists for records of "regularly conducted business activity." Ill. R. Evid. 803(6) (eff. Sept. 28, 2018). The proponent must show that the record was made as a record of the act, that it was made in the regular course of business, and that it was the regular course of business to make the record at or near the time of the act. *People v. Zaibak*, 2014 IL App (1st) 123332, ¶ 45. The proponent of a business record can establish the necessary foundation by providing a certification that complies with Illinois Rule of Evidence 902 or by testimony of the custodian of the records or "other qualified witness." Ill. R. Evid.

803(6). Here, Krukowski testified that he had an opportunity to review the records before testifying, that they were kept in the ordinary course of business, that it was the bank's regular practice to make records and investigative reports when an investigation into a bank account is opened, and that the reports and records were made at or near the time of the transactions and events they memorialized. The State satisfied Rule 803(6) with Krukowski's testimony.

¶ 57    Further, the maker of the record need not testify to lay sufficient foundation. *People v. Hutchison*, 2013 IL App (1st) 102332, ¶ 21. "Instead, anyone familiar with the business and its procedures may testify to the business record and compliance with the foundational requirements provides the indicia of reliability necessary for admission of the records." *Id.* At the time of trial, Krukowski had been a senior investigator for the preceding five months and a financial center manager for Bank of America for six years before that. He testified that he had access to the bank's business records in the regular course of business and was familiar with them. The records overall were properly admitted, and counsel was not ineffective for failing to object on those grounds.

¶ 58    Defendant raises a narrower issue as to the admissibility of entries within the case reviews and the accompanying testimony. As the State concedes, Krukowski's testimony consisted largely of reading from the bank records. Defendant specifically takes issue with portions of testimony where Krukowski read from the case review entries on the basis that the statements in the entries themselves contained hearsay. *Holland v. Schwan's Home Service, Inc.*, 2013 IL App (5th) 110560, ¶ 184 ("[W]hen a business record contains hearsay statements within the record, the hearsay statements within the record must also be admissible under an exception to the hearsay rule.").

¶ 59    In relevant part, Krukowski confirmed, based on an entry in the case review, that Bank of America employees flagged certain transactions as "suspicious." That entry simply listed a series

of transactions between Watanabe's and defendant's accounts. Other than its existence in the context of the case review, nothing in the entry itself described the transactions as suspicious. Krukowski's testimony that the transactions were suspicious was his own, and therefore not hearsay.

¶ 60    Krukowski also testified that, in an entry recounting a visit by Watanabe to a Bank of America location, the entry noted that Watanabe was "confused." The entry reads as follows: "verified associate *** has Christina Wright and Grace Watanabe. There is a caregiver in the lobby. Grace is confused with all of the conversations." Even assuming the entry was hearsay, and further that counsel was ineffective for failing to object, the second prong of *Strickland* still requires that counsel's failures prejudiced the defendant. *Domagala*, 2013 IL 113688, ¶ 36. As discussed, the basis for defendant's conviction was not that she took advantage of an incompetent victim but that she took Watanabe's funds without authorization and submitted a fraudulent letter to Bank of America. Further, the circuit court clearly did not decide defendant's guilt based on Watanabe's competency. It stated in announcing its findings that: "The Court would further note I know there were some arguments with regards to competence, but competence this Court does not find was an issue in this case." Absent prejudice, counsel was not ineffective for not objecting to this testimony.

¶ 61                                    D. Sentencing

¶ 62    Defendant argues the circuit court committed plain error where it relied on Watanabe's age and defendant's position at the facility as aggravating factors at sentencing when they are also factors inherent in the offense, an error known as "double enhancement." *People v. Gonzalez*, 151 Ill. 2d 79, 83-84 (1992) (explaining the "prohibition against the use of a single factor both as an element of a defendant's crime *and* as an aggravating factor" is "sometimes referred to as 'double

enhancement' " (emphasis in original)). Alternatively, she argues counsel was ineffective for failing to object on the same grounds. The State contends that while the circuit court mentioned facts that overlapped with elements of financial exploitation of the elderly, they were also necessarily considered as part of the nature and circumstances of the offense.

¶ 63   Defendant did not raise this issue by objection or in a posttrial motion below and thus, the issue is forfeit. Plain error review applies. *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). The first step in plain-error analysis is to determine whether a clear and obvious error occurred. *People v. Piatkowski*, 225 Ill.2d 551, 564-65 (2007); *Jackson*, 2020 IL 124112, ¶ 88 ("Without reversible error, there can be no plain error.").

¶ 64   The parties dispute the standard of review for the underlying error. Defendant argues for *de novo* review, the State for abuse of discretion. "Although the trial court has broad discretion in imposing a sentence [citation], the determination of whether the trial court made a double enhancement error is a question of law reviewed *de novo*." *People v. Shanklin*, 2014 IL App (1st) 120084, ¶ 91; *People v. Bowen*, 2015 IL App (1st) 132046, ¶ 49 (same).

¶ 65   "[A] single factor cannot be used both as an element of an offense and as a basis for imposing a harsher sentence than might otherwise have been imposed." (Internal quotation marks omitted.) *People v. Phelps*, 211 Ill. 2d 1, 11-12 (2004). The rationale for the rule is that by designating a range of punishment for a given offense, the legislature "necessarily considered the factors inherent in the offense." *Id.* at 12.

¶ 66   Here, the elements of the crime are (1) that defendant stood in a position of trust or confidence as to the victim, (2) that the victim was elderly, meaning 60 or older, and (3) that defendant knowingly obtained, by deception or intimidation, control over or illegally used the victim's assets. 720 ILCS 5/17-56(a), (c)(1). Defendant relies on the circuit court's remarks about

Watanabe's age and defendant's relationship to Watanabe as activities director at her facility:

> "I find the following: The factors in aggravation as the state presented are *the nature and facts of this offense*, the position of confidence and trust that the defendant was in as an employee, as the activities director at this elderly residential facility. That is how she gained access to the 90 something year old victim at the time." (Emphasis added.)

Bare commission of the underlying criminal act cannot weigh in aggravation at sentencing, but "the degree or gravity of [a] defendant's conduct" can. See *People v. Saldivar*, 113 Ill. 2d 256, 268-72 (1986); *People v. Tolliver*, 98 Ill. App. 3d 116, 117-18 (1981) (explaining that at sentencing a circuit court may "consider the nature and circumstances of the offense, including the nature and extent of each element of the offense as committed by the defendant"). These comments demonstrate the circuit court considered that defendant was in a position of trust and confidence as to Watanabe but also the nature of the position—defendant was employed at Watanabe's senior living facility. She also considered not just the fact that Watanabe was elderly, but that she was of very advanced age. The circuit court's statements go to the nature and extent of the conduct, not the basic elements of the crime charged, and thus, the circuit court did not improperly rely on factors inherent to the charged offense.

¶ 67    Further, the general prohibition on double enhancement yields to legislative intent— "where the legislature clearly intends to enhance the penalty based upon some aspect of the crime, and such an intention is clearly expressed, there is no prohibition." *Phelps*, 211 Ill. 2d at 15. The exploitation statute allows the circuit court to convict a defendant of a Class 1, 2, 3, or 4 felony depending on the amount of money involved and the age of the victim. 720 ILCS 5/17-56(b). Classes 2 through 4 encompass cases where the value of property ranges from $300 or less to $50,000. *Id*. But once the victim is 70 or older with property value exceeding $15,000, or the victim is 80 or older with property value exceeding $5,000, a defendant can be sentenced for a

Class 1 felony. *Id.*; 730 ILCS 5/5-4.5-30(a), (d) (West 2018) (permitting a sentence of up to 4 years' probation or 15 years' imprisonment for a Class 1 felony). The legislature deemed exploitation of an especially elderly individual to warrant a sentence of up to four years' probation or fifteen years' imprisonment, and thus, the circuit court did not err in relying in part on Watanabe's age to arrive at a sentence within that range.

¶ 68    Finally, even if the circuit court relied on elements inherent in the offense, whether reversible error occurred depends on the weight given to the improper factor at sentencing. *People v. Dowding*, 388 Ill. App. 3d 936, 945 (2009). Courts specifically consider "(1) whether the trial court made any dismissive or emphatic comments in reciting its consideration of the improper factor; and (2) whether the sentence received was substantially less than the maximum sentence." *Id.* Defendant faced up to 15 years in prison. She received four years' probation with no term of imprisonment. The circuit court declined to order restitution. This was a lenient sentence considering the facts of the case. Any reliance on elements inherent in the offense had a negligible impact, and therefore, no reversible error occurred. Without reversible error, there was no ineffective assistance. *People v. Hensley*, 2014 IL App (1st) 120802, ¶ 47 ("[T]he failure of a defendant to show that error occurred at all defeats both an ineffective assistance claim and a claim of error under either prong of the plain error doctrine.").

¶ 69                                    III. CONCLUSION

¶ 70    The judgment of the circuit court of Cook County is affirmed.

¶ 71    Affirmed.

*People v. Christina Wright*, **2026 IL App (1st) 240238**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2019 CR 6028301; the Hon. Pamela J. Stratigakis, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, State Appellate Defender, of Chicago (Douglas R. Hoff, Deputy Defender, Shay E. Saba, Assistant Appellate Defender, of counsel), for appellant. |
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John E. Nowak, Matthew Connors, Zachary M. Slavens, Assistant State's Attorneys, of counsel), for the People. |